FILED

2026 JUL -2 P 1:25

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

**ANN D. YANG, Ph.D.,**
Plaintiff,

Civil Action No. 1:26cv1954

v.

**JOHN RATCLIFFE, Director of the Central Intelligence Agency,**
Defendant.

**COMPLAINT FOR VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

**JURY TRIAL DEMANDED**

## I. INTRODUCTION

This is a civil action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as applied to federal employees by 42 U.S.C. § 2000e-16, to remedy the Central Intelligence Agency's discrimination against Plaintiff on the basis of national origin (Taiwan) and race (Asian, specifically Taiwanese of Hoklo ancestry), its retaliation against her for protected EEO activity, and the hostile work environment it permitted. Plaintiff asserts four claims under Title VII: retaliation (Count I); hostile work environment (Count II); constructive discharge (Count III); and disparate treatment based on national origin and race (Count IV).

At the heart of this case is a fact the Agency's own investigator already documented: the CIA retaliated against Dr. Ann D. Yang for protected EEO activity — a finding of per se reprisal recorded in the Agency's own Report of Investigation (ROI at 52). Dr. Yang is an accomplished

career educator — with more than two decades of university language instruction — whom the CIA recruited for her teaching expertise and native fluency, and who, in under three years, earned two Exceptional Performance Awards, a Meritorious Unit Citation, and consistently excellent student evaluations. After Dr. Yang opposed discrimination and entered the EEO process, her supervisors did not address her complaints; instead, they recast her protected EEO activity as disloyalty and a security concern, flagged her to the CIA security office, and manufactured a performance record to force her out. That engineered performance-improvement process — coupled with the denial of earned medical leave as her health deteriorated — rendered her position untenable and compelled her to resign.

The Agency denied Plaintiff's self-identification of race as "Hoklo Taiwanese," insisting throughout its own proceedings and affidavits that Plaintiff's national origin is "China" and that she is racially "Chinese," contradicting the Agency's own records and the complaint basis accepted by the Agency's Office of Equal Employment Opportunity ("OEEO"). The deliberate erasure of an employee's protected identity is itself an act of discrimination and direct evidence of animus, establishing discriminatory motive without resort to the inferential *McDonnell Douglas* framework. Plaintiff's national origin is Taiwan, and her race is Asian — specifically Taiwanese, of Hoklo ancestry; both are protected characteristics under Title VII. The operative distinction here is self-identified race, not national origin, which the Agency repeatedly blurred: Plaintiff's own manager and coworker are themselves of Taiwan national origin, yet identify their race as "Hakka/Mainland Chinese" or "Taiwanese Chinese." Plaintiff suffered discrimination because of the racial and ethnic distinction, not merely because of the national origin she shared with them.

The hostile work environment Plaintiff endured was, at its core, a retaliatory one. Animus toward her Taiwanese national origin and race triggered the initial harassment, but after Plaintiff opposed that conduct through her chain of command and the Agency's anti-harassment channels beginning in January 2020, and then through the EEO process, her supervisors escalated it rather than stopping it. The ensuing campaign — surveillance, a stigmatizing psychological referral, fabricated performance criticism, and the denial of earned medical leave — was severe and pervasive, was inflicted because of her protected activity, and ultimately forced her out.

The administrative proceedings spanned five years and were marked by procedural misconduct, structural conflicts of interest, and Agency fraud on the tribunal. On April 6, 2026, the EEOC Office of Federal Operations ("OFO") denied Plaintiff's Request for Reconsideration (Exhibit A), and this Complaint is timely filed within the ninety-day period under 29 C.F.R. § 1614.407(a). Throughout, the Agency and the EEOC avoided deciding these claims on their merits. This Court reviews them de novo, and the facts needed to prove them already exist in the unclassified record the Agency itself produced.

## II. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 2000e-16(c), which authorizes federal employees to file civil actions under Title VII after exhausting administrative remedies.

2. Venue is proper in this District under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(e). A substantial part of the unlawful employment practices alleged herein occurred within the Eastern District of Virginia, and the CIA's headquarters is located in Langley, Virginia, within the Alexandria Division of this Court.

3. Plaintiff has exhausted all required administrative remedies. The EEOC OFO issued its final decision denying Plaintiff's Request for Reconsideration on April 6, 2026 (Exhibit A). This Complaint is filed within ninety (90) days of that decision as required by 29 C.F.R. § 1614.407(a).

## III. PARTIES

4. Plaintiff Ann D. Yang, Ph.D. (the "Complainant" in the underlying administrative EEO proceedings), is a Taiwanese American female and a United States citizen. She was employed by the CIA from 2018 until April 16, 2021, when she was constructively discharged.

5. Defendant John Ratcliffe is the Director of the Central Intelligence Agency, an agency of the United States Government. He is sued in his official capacity. Under 42 U.S.C. § 2000e-16(a) and (c), the head of the employing department or agency is the proper defendant in a federal employee Title VII action.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. Plaintiff timely exhausted her administrative remedies. Beginning January 24, 2020, she engaged in protected activity under the opposition clause, 42 U.S.C. § 2000e-3(a), reporting and opposing harassment and disparate treatment through her chain of command, Human Resources, and the Agency's Anti-Harassment Program throughout 2020 and into 2021. In a separate internal track, she filed a formal Directorate Grievance Office (DGO) complaint on January 25, 2021, on which the Agency issued no findings. She then pursued the formal process under 29 C.F.R. Part 1614: notice of intent to file on

January 14, 2021; informal complaint on January 22, 2021; Notice of Right to File on March 31, 2021; and formal EEO complaint on April 9, 2021, amended on April 19, 2021 (constructive discharge) and August 10, 2021 (post-separation reprisal).

7. After the Agency issued its Report of Investigation — delayed well beyond the regulatory deadline and heavily redacted on national-security grounds — Plaintiff filed her Hearing Request on June 29, 2022. The delay and redactions compressed her discovery and are further alleged in Count I and below.

8. The hearing-phase record was fully developed on an unclassified basis. The Agency produced a 2,213-page Report of Investigation, and the parties completed documentary discovery and the depositions of five Responsible Management Officials — the entire evidentiary record was created, and the matter litigated through summary judgment, without recourse to classified information. In the course of that discovery, the Agency imposed approximately $16,401 in sole-source deposition costs, assessed through a required Agency vendor at rates exceeding the governing GSA contract, and it controlled the deposition transcripts and its Discovery Production, restricting Plaintiff's access. Because the material facts are already of record and unclassified, this action can be adjudicated on the existing record; Plaintiff intends to rely on the transcripts and documents already produced and to oppose any duplicative or repetitive discovery or re-deposition that would impose disproportionate cost and burden on a pro se litigant and replicate the cost-imposition documented herein.

9. The assigned EEOC Administrative Judge issued a Decision Without Hearing on November 28, 2023 (Exhibit C), adopting the Agency's summary-judgment briefing as the operative analysis rather than making independent findings; the Final Agency Order

issued December 21, 2023. The significance of that verbatim adoption is alleged in ¶¶ 46–47 and Count I.

10. Plaintiff appealed to the EEOC Office of Federal Operations (OFO) on January 19, 2024. OFO issued its appellate decision on September 22, 2025 (Exhibit B), reproducing the AJ's compromised decision rather than conducting the genuine de novo review required by 29 C.F.R. § 1614.405(a), as further alleged in ¶¶ 46–47 and Count I.

11. Plaintiff filed a timely Request for Reconsideration on October 20, 2025, within the 30-day period under 29 C.F.R. § 1614.405(c), raising the absence of genuine de novo review, the Agency's documented per se reprisal (ROI at 52), and unadjudicated errors regarding pretext, comparator evidence, and the alteration of her protected bases.

12. The Agency filed its opposition to reconsideration eight days after the regulatory deadline, without good cause. Plaintiff moved the same day to strike it and, on November 21, 2025, filed a Notice of Preservation of Due Process Claims under *Mathews v. Eldridge*, 424 U.S. 319 (1976), preserving objections to the untimely filing, the on-site-only document-access restriction, the mandated above-market deposition costs, and the security-clearance-driven withdrawals of her prior counsel.

13. OFO denied reconsideration on April 6, 2026 (Exhibit A) without ruling on the Motion to Strike and without addressing the substantive grounds Plaintiff raised, instead crediting the Agency's untimely opposition, as further alleged below.

14. Independent forensic analysis confirms that the Agency's summary-judgment positions were adopted and reproduced, largely verbatim, across the AJ's Order and both OFO decisions — a single-source derivation chain masquerading as three independent

adjudications, set out in ¶¶ 46–47. Administrative findings generated without genuine independent adjudication are entitled to no deference, and this Court reviews Plaintiff's claims de novo. *Chandler v. Roudebush*, 425 U.S. 840 (1976).

15. Plaintiff additionally raised these matters with the Intelligence Community Inspector General and the Department of Justice Office of Inspector General. Those whistleblower-channel referrals are separate from, and not a prerequisite to, this Title VII action, and are noted solely for completeness.

16. The April 6, 2026 OFO Reconsideration Denial (Exhibit A) is the final agency action. No further administrative remedy is available. This action is timely.

## V. FACTUAL BACKGROUND

### A. Plaintiff's Background, Qualifications, and Protected Characteristics

17. Plaintiff is a Taiwanese American and a career language educator who holds an advanced doctoral degree. Before joining the CIA, she taught Mandarin at the university level for many years, leading instructional teams and large annual enrollments, and is a published author of Chinese-language teaching materials. She has native-level (ILR-5) fluency in both Mandarin Chinese and Taigi (the Taiwanese language).

18. Plaintiff's protected bases and activity under Title VII are: (i) national origin — Taiwan; (ii) race — Asian, specifically Taiwanese of Hoklo ancestry (hereinafter "Taiwanese"); and (iii) prior protected EEO activity — participation in EEO proceedings as a complainant. To avoid the conflation of bases that occurred in the administrative proceedings, Plaintiff uses "Taiwan" solely to denote national origin and "Taiwanese" solely to denote race and ethnicity (ancestry); the two are distinct protected bases and are

not used interchangeably. The United States Census Bureau's 2020 detailed race classification separately identifies "Taiwanese" as a distinct Asian subgroup, independent of "Chinese," consistent with Plaintiff's self-identification and with federal recognition that Taiwanese constitute a distinct racial and national-origin group.

19. The Taiwanese of Hoklo ancestry and heritage, including Plaintiff, are ethnically and culturally distinct from Mainland Chinese persons (Mainlanders) on or from Taiwan — a distinction recognized as a matter of historical and cultural fact and protected under Title VII. The distinction of Taiwanese vs. Mainlanders is the Agency's own: the CIA's National Intelligence Estimates NIE 43-61 (1961) and NIE 43-64 (1964) expressly distinguish the "Taiwanese" majority from the "Mainlanders" minority that then occupied Taiwan, and the CIA World Factbook continues to identify the native Taiwanese (Holo [*sic*]) population — approximately seventy percent of Taiwan — as distinct. The responsible officials here drew that same Mainlanders-versus-Taiwanese distinction; they identified as "Hakka/Mainland Chinese" or "Taiwanese Chinese," while Plaintiff is "Hoklo Taiwanese."

20. During Plaintiff's CIA employment (2018–2021), she earned two Exceptional Performance Awards, a Meritorious Unit Citation, positive annual performance reviews, and consistently near-perfect student and training-officer evaluations. After leaving the CIA she was hired by another federal employer at a higher grade, passed a separate, full security-clearance adjudication, and earned a distinguished, merit-based performance award in her profession. This unbroken record of professional excellence is irreconcilable with any genuine performance deficiency and directly supports pretext as to each of Plaintiff's claims.

21. Despite Dr. Yang's unique qualifications, the Agency — acting through supervisors May F. and Sondes D., with institutional involvement of CIA OGC — subjected Dr. Yang to a sustained pattern of discriminatory treatment, retaliation, and procedural misconduct that ultimately forced her constructive discharge.

**B. Retaliation, Including Acts Constituting Per Se Reprisal**

22. Per se retaliation encompasses acts "reasonably likely to deter protected activity," without additional showing of material harm. See *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The CIA engaged in multiple acts constituting per se retaliation, each independently sufficient.

23. On January 26, 2021, supervisor Sondes D. forwarded Plaintiff's EEO disclosures to Michael R. On January 27, 2021, Michael R. subsequently 'flagged' Plaintiff to CIA security personnel, initiating a security referral directly tied to Plaintiff's protected EEO activity. Initiating a security investigation because an employee exercised EEO rights is per se retaliatory. The 164-day gap between this January 26, 2021 referral and any July 9, 2021 adjudicator contact forecloses the Agency's argument that Plaintiff's May 20, 2021 PSR rebuttal was the triggering event.

24. On April 22, 2021 — six (6) days after Plaintiff's resignation on April 16, 2021 — supervisor May F. was actively inquiring about revoking Plaintiff's security clearance. Agency Discovery Production at 215. Post-separation pursuit of clearance revocation without a legitimate security basis is reasonably likely to deter EEO participation by current and prospective Agency employees.

25. The Agency's mandated use of a sole-source court reporter at $16,401 for six depositions — five noticed by Plaintiff (May F., Anna C., Sondes D., Michael R., and Huey L.) and the Agency's deposition of Plaintiff — plus a copy of Plaintiff's own transcript, at per-page rates of approximately $16.93 against a GSA contract (GS-02F-141AA) ceiling of $8.22 for the highest delivery tier, impaired Plaintiff's ability to develop the evidentiary record. This financial barrier, imposed asymmetrically and not on the Agency, constitutes an act of reprisal.

26. The Agency's restriction of OGC document review to on-site-only access, without providing equivalent means to Plaintiff, imposed an asymmetric procedural burden impeding protected activity.

27. Responsible Management Officials ("RMOs"), including supervisors May F. and Sondes D., disclosed Plaintiff's protected EEO activities to individuals not authorized to receive such information under the EEO process. ROI at 52. More critically, the RMOs expressly linked Plaintiff's EEO complaint to her performance, treating the exercise of EEO rights as a performance-relevant factor. ROI at 52. Disclosure of an employee's EEO complaint to unauthorized parties constitutes per se retaliation. Linking a formal EEO complaint to a performance evaluation is, in and of itself, retaliatory, as it would dissuade a reasonable employee from making or supporting a discrimination charge. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69 (2006).

### C. Hostile Work Environment and Constructive Discharge

28. Beginning no later than 2019 and continuing through Plaintiff's forced resignation on April 16, 2021, Plaintiff was subjected to a hostile work environment that was, at its core, retaliatory. The harassment originated in animus toward her national origin (Taiwan) and

race (Taiwanese, of Hoklo ancestry); Plaintiff opposed that discriminatory conduct — beginning no later than late 2019 and continuing in January 2020 — by reporting and objecting to it through her chain of command and the Agency's anti-harassment channels. That opposition was protected activity under Title VII's opposition clause, 42 U.S.C. § 2000e-3(a). Rather than remediate the harassment, Plaintiff's supervisors escalated and sustained it because of her protected activity, and later because of her formal EEO participation. The conduct was severe or pervasive and unreasonably interfered with the terms, conditions, and privileges of Plaintiff's employment. That retaliatory campaign included, but was not limited to, fabricated performance interventions engineered to justify termination, a coerced psychiatric referral, and escalating performance-management pressure timed to Plaintiff's EEO filings.

29. Supervisor May F. labeled Plaintiff "Fukian" *[sic]* — a rendering of "Fukien" (Fujian), the southeastern Chinese province from which Hoklo ancestors migrated to Taiwan centuries ago. Applied to Plaintiff, a Hoklo Taiwanese American, the term was no neutral geographic reference: by defining her by her ancestors' Chinese provincial origin rather than her own Taiwanese identity, it reclassified her as Chinese, treated Taiwan as part of China, and denied that Taiwanese is a distinct people — the same subordinating move by which native Taiwanese have long been tied to a Mainland Chinese identity. Directed at Plaintiff, that epithet reflects discriminatory animus on the bases of both national origin (Taiwan) and race (Taiwanese, of Hoklo ancestry). Coworker Huey L. — who self-identified as 'Taiwanese Chinese' and whose hostility toward Plaintiff reflected precisely the ethnic hierarchy underlying the 'Fukian' or 'China/Chinese' epithet — engaged in a sustained pattern of discriminatory harassment beginning no later than 2019. Huey L.

sent Plaintiff a threatening text message late at night on July 30, 2020: "Don't get yourself hurt." On December 10, 2020, Huey L, without proper authorization, replaced Plaintiff's designated substitute instructor and dismissed the class early, while Plaintiff was on approved sick leave, thus forcing Plaintiff to make up missed classroom hours. On January 22, 2021 — the same day Plaintiff submitted her informal EEO complaint to OEEO — Huey L. accompanied supervisor Sondes D. in surveillance outside Plaintiff's workspace. Management was on notice of this conduct yet took no remedial action; instead, around March 29, 2021, supervisors received and transmitted Huey L.'s false reports as factual predicates for the adverse performance narrative constructed against Plaintiff. Under the employer-negligence standard applicable to coworker harassment (*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)), and the cat's paw liability doctrine (*Staub v. Proctor Hospital*, 562 U.S. 411 (2011)), the Agency's knowing adoption of Huey L.'s discriminatory animus as supervisory action imputes that animus to the Agency for purposes of Title VII liability.

30. CIA officials' deliberate substitution of 'China' and 'Chinese' for Plaintiff's stated national origin 'Taiwan' and racial identity 'Taiwanese American' throughout EEO proceedings — and their use of the term 'Fukian' (a term used by Mainland Chinese (or Mainlanders) to deny Taiwanese identity) — constitutes direct evidence of discriminatory animus. Under Title VII, 'an unlawful employment practice is established when the complaining party demonstrates that [a protected characteristic] was a motivating factor for any employment practice.' 42 U.S.C. § 2000e-2(m). 'Title VII prohibits certain motives, regardless of the state of the actor's knowledge.' *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 (2015). Independent of *Abercrombie* — under which

discriminatory motive suffices regardless of knowledge — the record here shows actual knowledge. Whatever latitude an ordinary employer might claim for conflating Taiwan with China, these defendants are charged with the distinction: the Agency's own analytic products draw it (NIE 43-61; NIE 43-64; the CIA World Factbook), its workforce includes area and language professionals. Their persistent relabeling of Plaintiff as "Chinese" was therefore knowing, not inadvertent — probative of animus and foreclosing any good-faith-mistake defense. The *McDonnell Douglas* burden-shifting framework is therefore inapplicable: CIA's conduct in the record proves discriminatory motive without inference. The Agency's active denial of Plaintiff's identity as Taiwanese American — and its institutional insistence that she is 'Chinese' — is itself the discrimination. OGC's invocation of a "no knowledge" defense was not only legally untenable under *Abercrombie* — it was contradicted by the Agency's own record. The Agency's dispositive briefing asserted repeatedly, throughout its brief, that its officials "did not know" Plaintiff was Hoklo while, in the same proceedings, characterizing her as "Chinese" and describing "Hoklo" as merely "an area in China" — even though Agency OEEO had already formally accepted "Hoklo Taiwanese" as Plaintiff's race. That the Agency simultaneously disclaimed knowledge of an identity it had officially recorded, and substituted a Chinese identity in its place, establishes that the "no knowledge" position was willfully false under 18 U.S.C. § 1001.

31. Where stereotyped assumptions about an employee's racial group are documented in supervisory communications and translated into adverse performance characterizations, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250–51 (1989), establishes that such conduct constitutes direct evidence of discrimination, eliminating the need to rely on the

*McDonnell Douglas* inference framework. Direct evidence of discriminatory motive — demonstrated here by the use of the ethnically demeaning "Fukian" epithet, the submissiveness expectations documented in performance evaluations, and the institutional conflation of Plaintiff's Taiwanese identity with Chinese/Mainland identity — proves discriminatory animus without resort to circumstantial inference.

32. On August 17, 2020, May F. sent an email to the Unit front office — the division's front office — with the subject heading "Concerns about [CP]," requesting that the Unit front office "[p]lease advise the next course of action in terms of termination of [CP's] employment at CIA." That email contained fabricated performance characterizations that had never been documented, formally addressed, or communicated to Plaintiff. On September 4, 2020, management issued a formal Management Referral compelling Plaintiff to "meet and cooperate with the assigned EAP counselor" for a "psychological consultation," demanded that Plaintiff sign a medical-records release on the spot, and followed up on compliance no fewer than five times. No clinical basis existed for the referral; it served instead to pathologize Plaintiff's protected EEO-related complaints, stigmatize her in the eyes of management colleagues, and create a paper record of purported instability. Both the termination-advocacy email and the compelled EAP referral followed Plaintiff's protected opposition to discrimination in late 2019 and January 2020 and — though they preceded any formal EEO complaint — independently constitute retaliatory and per se reprisal acts. A compelled EAP examination — as distinct from a voluntary or merely offered referral — is itself a cognizable injury and adverse action for EEO purposes. See *Stockard v. Dep't of the Army*, EEOC Appeal No. 0120100426 (May 19, 2011).

33. The Agency's annual performance review process was simultaneously used as a vehicle for reprisal. For FY2020, supervisors Anna C. and May F. included comments in Plaintiff's Performance Summary Report (PSR) questioning her "commitment" to the Agency — a characterization untethered to objective performance standards and delivered without prior written feedback or documented deficiency. Plaintiff submitted a formal rebuttal, and on October 22, 2020, the decision was issued in Plaintiff's favor. Within ten working hours of that rebuttal decision officially posted — on October 26, 2020 — May F. abruptly reversed a previously approved teaching assignment, reassigning to Plaintiff a class that was behind schedule and that had been withheld from Huey L., the co-worker who served as the principal source of on-the-job harassment against Plaintiff. On November 4, 2020, May F. (chief of Plaintiff's department within the Unit) and Sondes D. began developing a formal performance-action "game plan" with Michael R. (then a chief of a separate department within the Unit); school head Jacqueline L. met with them that same day to instruct them on using an Advanced Work Plan (AWP)-to-PIP pipeline as a sequential termination mechanism.

34. On December 3, 2020, Plaintiff received a 90-day Advanced Work Plan (AWP) from Sondes D. and May F., delivered during what was framed as an introductory "meet-and-greet" with her newly assigned supervisor, namely Sondes D., who replaced Anna C. as Deputy Dept. Chief. The AWP imposed non-standard, customized Key Job Expectations (KJEs) with no counterpart in Agency-wide practice; no prior documented performance deficiency justified them; and the Agency's production responses confirm no policy basis for an AWP instrument of this kind. On December 18, 2020, the AWP was rescinded — Sondes D. stating "[w]e are not putting in place the AWP" — but the records were

preserved and used as the predicate for subsequent adverse actions. Beginning in January 2021, concurrent with Plaintiff's EEO complaint activity, the retaliation escalated sharply: on January 14, 2021, within hours of Plaintiff notifying the OEEO of her intent to file a complaint, Michael R. briefed Jacqueline L. and formulated a plan with May F. and Sondes D. On January 22, 2021 — the same day Plaintiff submitted her informal EEO complaint to OEEO — May F. distributed to the Unit front office a fabricated "Performance Timeline [CP]" backtracking to August 2020, based on templates Michael R. had provided in November 2020. New KJEs were entered into the Performance Appraisal System (PAS) around January 25, 2021. From March 8 through April 7, 2021, CIA OGC counsel actively guided May F. and Michael R. on PIP implementation procedures and official-time restrictions for Plaintiff's EEO participation, as documented in extensive email correspondence. May F. explicitly threatened Plaintiff with a PIP on March 25 and April 7, 2021. On April 7, 2021, Michael R. authorized May F. in writing to proceed with a close-out PSR triggering a PIP "now," stating there was "[n]o need to wait for fresh episodes." Plaintiff suffered a fever and severe abdominal pain on April 12, 2021 — consistent with a serious medical condition later confirmed to have been present during her Agency employment. On April 13, 2021, Plaintiff submitted her resignation, effective April 16, 2021. After Plaintiff's departure, May F. waited until the PAS system's "not meeting expectations" button was activated — 90 days after updating Plaintiff's KJE entry in the week of January 25, 2021 — to formally trigger the PIP in Plaintiff's close-out PSR, confirming that the PIP had been planned as a termination instrument rather than a legitimate performance management measure.

35. On April 16, 2021, Plaintiff resigned from her CIA position. Under the standard established in *Carmon-Coleman v. Dep't of Defense*, EEOC Appeal No. 07A00003 (Apr. 17, 2002), and confirmed by the Supreme Court in *Green v. Brennan*, 578 U.S. 547 (2016), Plaintiff's resignation constitutes constructive discharge. All three required elements are satisfied. First, a reasonable person in Plaintiff's position would find the working conditions intolerable: she had been subjected to a pre-determined plan to terminate her employment beginning no later than August 17, 2020; a coerced psychiatric referral used to recast her protected complaints as psychological issues; serial fabricated performance interventions timed to EEO filings; an AWP imposed without regulatory basis and then rescinded; escalating PIP threats culminating in explicit authorization on April 7, 2021 to proceed "now" without waiting for "fresh episodes"; and ongoing denial of leave for medical appointments while her physical health deteriorated. Second, the conduct creating those conditions was discriminatory and retaliatory within the meaning of Title VII. Third, Plaintiff's resignation was the direct and involuntary result of those intolerable conditions. *Green v. Brennan* forecloses any requirement that Plaintiff also prove her resignation was the Agency's plan from the outset; the discriminatory and retaliatory conditions themselves were sufficient. 578 U.S. at 555.

36. Plaintiff's resignation was not voluntary in any legally cognizable sense. Had she remained, Plaintiff would have been placed on a PIP that, under the Agency's own written policy, rendered employees ineligible for performance recognition, promotions, Quality Step Increases, Exceptional Performance Awards, Within-Grade Increases, bonuses, and the right to apply for new assignments or request a change in career service. The Agency's plan — documented in management emails as early as August 17, 2020,

and confirmed as imminent no later than April 7, 2021 — was to terminate Plaintiff's employment through the AWP-to-PIP pipeline regardless of her actual performance. May F.'s August 17, 2020 email requesting the Unit front office guidance on "the next course of action in terms of termination of [CP's] employment," the Unit front office's "game plan" developed on November 4, 2020 for " the application of KJEs, AWP, and possible PIP to the situation," and Michael R.'s April 7, 2021 authorization to proceed "now" without waiting for "fresh episodes," establish that the termination decision was made well before any legitimate performance concern could have arisen. Plaintiff's constructive discharge was the foreseeable and intended result of the Agency's discriminatory and retaliatory conduct. Back pay liability runs from April 16, 2021 through the date of judgment or reinstatement.

37. Plaintiff's serious illness developed during, and was aggravated by, her CIA employment. Beginning in late 2019 and worsening through 2020–2021, she suffered recurring acute abdominal pain while carrying an intensive, high-stakes teaching load with little respite between rotations. She sought to use her substantial accrued annual and sick leave for medical examination and treatment, but the responsible officials denied and delayed those requests (see ¶ 38), forcing her to postpone care as her symptoms worsened — including an acute episode of fever and severe abdominal pain on April 12, 2021, the day before she resigned. The condition was later confirmed to have been present during Plaintiff's employment: after her constructive discharge, Plaintiff was treated on an emergency basis, diagnosed with kidney stones, initially diagnosed with a renal malignancy, and underwent two surgeries that confirmed the tumor was benign. The Agency's excessive workload and denial of medically necessary leave materially contributed to the

progression of Plaintiff's illness. This physical harm supports substantial compensatory damages under 42 U.S.C. § 1981a(b)(3)(D) and equitable relief.

38. The denial of medical leave was deliberate and departed from the Agency's own leave practice. In August 2020, Plaintiff requested to use her accrued annual and sick leave balances, which were well above the unit norm, for medical examinations and treatment. Management first contested the configuration of that leave, then, on or about October 29, 2020, denied her second leave request outright, accusing her of "lacking team spirit"; in January 2021, supervisors further delayed approval of her calendar-year leave. These denials occurred even as the Agency approved far longer continuous leave for others — including an extended six-week leave for a supervisor and multi-month leaves for comparator instructors. The denial of Plaintiff's comparatively modest, medically necessary leave, while she carried the unit's heaviest workload, was both an adverse action and a material cause of the deterioration of her health.

**D. Disparate Treatment**

39. The Agency treated Plaintiff materially worse than similarly situated comparator SJ — a female employee of Taiwan national origin who self-identified as Asian, did not self-identify as Hoklo Taiwanese, and had engaged in no EEO activity in 2020-2021. SJ was favored in overtime assignments and in monetary awards. ROI at 52–53, 549–550, 1436, 1439–1441, 1723. This differential treatment evidences direct retaliation (Count I) and, under the intra-group theory pleaded in ¶¶117–118, national origin and race discrimination (Count IV).

40. OGC's Pre-Hearing Involvement Evidenced by Privilege-Blacked-Out Emails. CIA OGC's assertion of attorney-client privilege provides concrete documentary evidence of

its impermissible pre-hearing involvement in Plaintiff's EEO proceedings. During the administrative process, email exchanges between OGC and supervisors May F. and Sondes D. are systematically blacked out in the ROI under "Attorney-Client Privileged Information" designations, with no accompanying privilege logs. These blanket designations are procedurally deficient under the FRCP 26(b)(5) analogue applied in federal EEO proceedings per MD-110, Ch. 7, § IV.D.3, and substantively improper under *Hickman v. Taylor*, 329 U.S. 495 (1947), which does not protect routine managerial advice or coordination on adverse employment actions. MD-110, Ch. 1, § III expressly prohibits adversarial counsel from communicating directly with management officials on an active EEO matter.

41. Inconsistent Privilege and Redaction Designations Reveal Pretextual Concealment. The documentary record reveals that the Agency applied inconsistent privilege and redaction designations to suppress the same content across different productions. The identical passage in an email from May F. (January 14, 2021, Subject: '[CP] sharing') (a) bears national security redaction markings in the ROI at 1484, but (b) is re-designated as "Attorney-Client Privileged Information" in the Agency Discovery Production at 239. Executive Order 13526, § 1.7 expressly prohibits classifying information to conceal violations of law, inefficiency, or administrative error, or to prevent embarrassment to an organization. The re-designation of the same passage from a national security redaction to an attorney-client privilege designation is independently probative of manipulated productions constituting fraud on the administrative tribunal under *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944).

42. Refusal to Provide Redacted Discovery Copies Imposed Asymmetric Litigation Burden. Agency OGC refused to provide Plaintiff with redacted copies of the full Discovery Production, notwithstanding that redaction—rather than wholesale withholding—is the standard remedy under MD-110 § 6-21, which requires that all parties hold the same complaint file with identical redactions applied. Instead, the Agency required Plaintiff to travel to Agency premises—more than forty miles from her work location since May 2023—to review documents on-site and take manual notes, a condition not imposed on Agency counsel. This asymmetric discovery condition constitutes an independent due process violation cognizable under *Mathews v. Eldridge*, 424 U.S. 319 (1976).

43. CIA official Jacqueline L. submitted a sworn affidavit characterizing the team award received by comparators Huey L., SJ, and NS as non-monetary, contradicting Jacqueline L.'s own July 28, 2021, email. This is also directly contradicted by Agency documents, which confirm that the award was monetary. This false affidavit, submitted in a federal administrative proceeding, violates 18 U.S.C. § 1001 and supports the fraud-on-the-tribunal theory under *Hazel-Atlas*.

44. The Agency deliberately altered Plaintiff's protected bases in official proceedings: substituting "Taiwanese" for "Taiwan" as national origin, and reducing Plaintiff's race from "Hoklo Taiwanese American" to the single word "Hoklo." These alterations appear in Agency OGC Interrogatory No. 8, Requests for Admission Nos. 1–2, and the Agency's Motion for Summary Judgment. The bases alteration demonstrates institutional refusal to recognize Taiwanese American identity as a cognizable protected characteristic — itself an act of discrimination. Specifically, the manipulation proceeded in two steps: Agency OEEO accepted Plaintiff's self-identification as "Asian American, Hoklo Taiwanese

American" but abbreviated it to "Hoklo" alone in official proceedings; Agency OGC then attacked the OEEO-created "Hoklo" label as non-cognizable — exploiting a gap the Agency itself created. Agency OGC further conflated Plaintiff's national origin with "Taiwanese" (blurring race and national origin) and characterized Plaintiff's race as "Chinese" in multiple submissions, directly denying her documented self-identification. Plaintiff raised and documented these manipulations throughout the administrative record; the AJ and OFO ignored them entirely. The intra-filing contradiction within OGC's May 17, 2023 discovery responses is independently probative: the same submission listed team members' national origins as 'Taiwan' and 'China' in Interrogatory No. 8 while, in the identical filing, denying any knowledge of Plaintiff's Taiwan national origin in Response to Request for Admission No. 1 and denying outright that Plaintiff's race is Hoklo Taiwanese in Response to Request for Admission No. 2 — directly contradicting OEEO's March 2021 accepted claims. In the OGC-redacted version of Interrogatory No. 8 produced to Plaintiff, OGC additionally redacted all race and national origin data in their entirety, asserting no legal authority for doing so. In its October 4, 2023 Reply in Support of MSJ, OGC fabricated May F.'s racial identity — sworn self-identified as Hakka/Mainland Chinese — by characterizing May F. as 'Complainant-Taiwanese' at least twelve times, thereby eliminating the intra-racial comparator differential that would otherwise have established Plaintiff's Count IV theory. *Village of Freeport v. Barrella*, 814 F.3d 594, 608–10 (2d Cir. 2016) (ethnicity/ancestry constitutes cognizable race under Title VII and 42 U.S.C. § 1981); 18 U.S.C. § 1001 (willful false statements in federal administrative proceedings).

45. All adverse employment actions alleged herein caused "some harm" to the terms, conditions, or privileges of Plaintiff's employment, satisfying the standard articulated in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), which rejected any requirement of "materially significant disadvantage."

**E. Structurally Compromised Administrative Process and Due Process Violations**

46. The misconduct described in this subsection is the factual predicate for the retaliatory-obstruction allegations in Count I (¶¶ 84–94) and supports de novo review of all claims. The EEO adjudicative proceedings were infected by structural defects and Agency misconduct that, taken together, constitute fraud on the administrative tribunal within the meaning of *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944). The CIA's Office of General Counsel submitted a Motion for Summary Judgment (August 9, 2023) that contained false and misleading statements of material fact, each of which was directly contradicted by the Agency's own Report of Investigation. Those misrepresentations include:

**(a)** in formal discovery responses, OGC denied that Plaintiff's national origin is Taiwan [Request for Admission ('RFA') No. 1)] and that her race is Hoklo Taiwanese (RFA No. 2) — positions squarely contradicted by the Agency's own OEEO investigation and the ROI;

**(b)** OGC characterized the per se reprisal violation — identified and documented by the Agency's own OEEO investigator at ROI at 52 — as a "new claim" invented by Plaintiff (Agency Reply, October 4, 2023), directly misrepresenting the administrative record to the AJ;

**(c)** OGC denied in sworn discovery responses that Plaintiff was presented with a 90-day Advanced Work Plan on December 3, 2020 (RFA No. 13) and that the AWP was later rescinded — both facts confirmed — and separately certified that there were "no responsive documents" to any Agency policy governing AWPs, insulating the unlawful performance action from regulatory scrutiny;

**(d)** OGC denied that the September 4, 2020 EAP Management Referral memorandum was presented to Plaintiff and that she was asked to sign it on the spot (RFA No. 12), contradicted by the records in the ROI.

**(e)** OGC denied that supervisors May F., Sondes D., and Anna C. had awareness of Plaintiff's protected race, national origin, or EEO activity prior to January 25, 2021 (RFAs Nos. 6-10), contradicted by the records in the ROI; and

**(f)** in the Agency's Discovery Production, OGC invoked attorney-client privilege to redact passages that appeared unredacted in the ROI — a selectively inconsistent privilege assertion designed to suppress direct evidence of RMO-OGC coordination in furtherance of retaliatory performance actions.

47. Forensic Confirmation of the Verbatim Chain: OGC → AJ → OFO Appeal → OFO RFR. A forensic comparison of all three layers of EEOC/OFO decisions and the underlying party (OGC) submissions establishes the following derivation chain with documentary precision:

**(a)** OGC MSJ/Reply → AJ Order: The AJ expressly adopted OGC's brief as her operative analysis; key phrases including "routine workplace activity" and "no per se violation" originate in OGC's briefing and are absent from Plaintiff's 151-page (~50,000-

word) Opposition; the AJ wrote no analysis of comparator evidence, Requests for Admission denials, PSR adjudicator disclosure timeline, OGC adversarial involvement, or pattern-of-discrimination evidence.

**(b)** AJ Order → OFO Appellate Decision: OFO reproduced verbatim the AJ's "painstaking detail" passage and the "remarks about her protected activity that could be construed as negative or likely to deter" passage, among numerous others, while never independently addressing the AJ's explicit adoption as an independent basis for appellate reversal.

**(c)** OFO Appellate Decision → OFO RFR Decision: OFO's RFR Decision reproduces more than twenty-five verbatim passages from the Appellate Decision — including both the "painstaking detail" passage (now appearing for the third consecutive time across three nominally independent decisions) and the "remarks about protected activity" passage — while dismissing Plaintiff's documented RFR arguments in two conclusory sentences. Plaintiff's briefs raised numerous substantive arguments — including fraud on the tribunal, OGC's adversarial pre-hearing involvement, deposition obstruction, national-security redaction abuses, the OFO's protracted processing delay, the Administrative Judge's conflict of interest, and due-process violations — none of which were addressed at any administrative level.

An administrative process that systematically ignores the arguments presented to it has not adjudicated those claims; it has foreclosed them procedurally without engagement. Under *Chandler v. Roudebush*, 425 U.S. 840 (1976), the district court's review of all claims should be entirely de novo; the administrative record as generated provides no basis for deference.

48. The administrative record contains at least three independent acts of fraud on the tribunal, each independently sufficient for vacatur under *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245–46 (1944): (1) the AJ's verbatim adoption of CIA OGC's summary judgment briefing as "the operable analysis for this Decision" without independent factual findings, resolving no material factual disputes, and OFO's subsequent verbatim reproduction of that analysis — producing a single-source derivation chain masquerading as three independent adjudications; (2) CIA official Jacqueline L.'s sworn affidavit falsely characterizing as "non-monetary" an award documented as monetary in the Agency's own records, which was never corrected by OGC in any subsequent filing; and (3) OGC's reliance on coworker Huey L.'s fabricated reports as factual support for summary judgment, which the AJ credited without inquiry. *Hazel-Atlas* authorizes this Court to vacate all administrative findings and adjudicate each count de novo, without deference to any prior determination. See *Chandler v. Roudebush*, 425 U.S. 840 (1976).

49. OFO's appellate decision (September 22, 2025) failed to conduct the genuine de novo review required by 29 C.F.R. § 1614.405(a). Seventy to eighty percent of OFO's decision reproduced the structurally compromised AJ analysis, which was itself a reproduction of Agency OGC advocacy. OFO concluded there was "no colorable evidence" of per se reprisal — a finding that expressly contradicts the Agency's own investigator's documented finding at ROI at 52 and ignores the uncontested record of twenty-one (21) ex parte RMO communications to PSR Rebuttal Adjudicator GJ on June 29–30, 2021 that occurred before Plaintiff's July 9, 2021 disclosure to that adjudicator. Additionally, Sondes D.'s January 26, 2021 disclosure of Plaintiff's EEO activities and Michael R.'s

subsequent January 27, 2021 referral of Plaintiff to CIA security personnel based on her EEO activity — 164 days before any adjudicator contact — initiating a security file linked directly to Plaintiff's protected EEO activity. This January 2021 security disclosure is legally and temporally distinct from the June 2021 ex parte communications to PSR Rebuttal Adjudicator GJ, constituting two independent acts of per se retaliation under Burlington Northern. OFO's adoption of OGC's mischaracterization of per se reprisal as a "new claim" — a characterization that the ROI itself refutes — perpetuated the AJ's non-merits adjudication and denied Plaintiff the appellate review she was owed. Moreover, OFO's operative conclusion — that "the AJ correctly determined" the preponderance of the evidence did not establish discrimination — is itself an abdication of de novo review: by asking only whether the AJ "correctly determined" the question, rather than independently assessing the record, OFO applied the deferential appellate posture that 29 C.F.R. § 1614.405(a) forbids. Additionally, the AJ's November 28, 2023 decision gratuitously disclosed private, personal information concerning Plaintiff's designated representative that was irrelevant to any issue in the case, absent from any EEOC procedural requirement, and included solely to imply impropriety — a disclosure contrary to the protections of the Privacy Act, 5 U.S.C. § 552a, and in breach of the EEOC's impartiality mandate under MD-110, Ch. 6 § IV.A and 5 U.S.C. § 2302(b)(9). The disclosure also contained factual errors regarding the duration of the representation and followed Agency OGC's physical removal of Plaintiff's representative from Agency OEEO premises during a case-file review on June 15, 2023, and its demand for re-vetting of a representative who had been duly designated since January 22, 2021 and was already vetted.

50. OFO accepted and credited the CIA's untimely November 17, 2025 Opposition — filed eight days past the twenty-day deadline — without ruling on Plaintiff's Motion to Strike, and without according Plaintiff equivalent procedural latitude. OFO's April 6, 2026 denial explicitly relied on arguments found only in the untimely filing, violating Plaintiff's right to notice and a meaningful opportunity to be heard under *Mathews v. Eldridge*, 424 U.S. 319 (1976).

51. The CIA's OEEO is not structurally independent of CIA OGC. The Agency's concurrent roles as investigator, advocate, and de facto adjudicator — evidenced by the AJ's verbatim incorporation of OGC briefing — created a constitutionally intolerable conflict of interest permeating the proceedings from investigation through appellate review. Agency OGC compounded this structural conflict through targeted discovery obstruction: despite an AJ Discovery Order on June 15, 2023 requiring production of the CIA's governing performance management regulation, OGC refused to produce it, certifying instead that no responsive documents existed — the same regulation whose absence enabled OGC to characterize the non-standard AWP imposition and PIP pipeline as "routine managerial practice" without evidentiary contradiction. OGC separately withheld Agency performance-related policies despite Plaintiff's May 26, 2023 supplementation request. This withholding and AJ's disregard of ICD-651 (the public ODNI performance management directive for IC civilian workforce) prevented Plaintiff from rebutting OGC's pretextual characterizations and enabled the AJ and OFO to adopt them without a regulatory context. Injunctive relief requiring structural separation of OEEO from OGC functions is warranted. Evetta Harold — the CIA's Director of the Office of Equal Employment Opportunity from June 2019 through May 23, 2023, who

oversaw Yang's administrative case from its inception — subsequently brought suit in the United States District Court for the District of Columbia alleging that CIA Chief Operating Officer (CIA/COO) Maura Burns, who oversaw both the Agency OEEO and OGC: (1) refused to comply with the Elijah E. Cummings Federal Employee Antidiscrimination Act of 2020 (effective January 1, 2021), which requires the OEEO Director to report directly to the Agency head rather than to the CIA/COO; (2) possessed detailed knowledge of confidential ongoing EEO cases and intervened in specific matters to protect favored officials; and (3) removed Harold and her Deputy within hours of their protected disclosure to the Intelligence Community Inspector General on May 23, 2023. *Harold v. CIA*, No. 1:25-cv-04086 (D.D.C. filed Nov. 20, 2025). Harold's removal occurred while Yang's case was actively pending before the EEOC AJ, and the Final Agency Order was subsequently signed by Harold's following replacement (whose prior service at the CIA Office of Inspector General (OIG) created an additional appearance of institutional conflict of interest) — confirming a mid-case leadership disruption that further compromised institutional impartiality. The structural independence failure was thus not merely formal: it was operationally exploited by the Agency's own Chief Operating Officer to influence EEO proceedings at the supervisory level, exactly as alleged by the official responsible for overseeing those proceedings.

52. The CIA's structural indifference to EEO independence is not limited to the Agency-level reporting chain documented in *Harold v. CIA*. It recurs at the supervisory level in an equally direct form. Michael R. occupied three successive roles material to this action. Prior to approximately January 18, 2021, he served as a department chief within the Unit — heading a department separate from Plaintiff's, outside her management chain,

engaged in her performance campaign because he was the designated Responsible Management Official (RMO) for prior EEO complaints within the Unit. On November 4, 2020, while in that department-chief capacity and acting under the direction of the Unit Director Jacqueline L., Michael R. provided May F. and Sondes D. with the AWP template and stated in writing: "I also walked them through how to strategize the application of KJEs [Key Job Expectations], AWP, and possible PIP to the situation." On approximately January 18, 2021 — four days after Plaintiff first formally disclosed her EEO intent on January 14, 2021 — Michael R. was appointed Chief Operating Officer (COO) of the Unit, placing him in supervisory command over Plaintiff's unit at the precise moment the retaliatory performance campaign escalated. In that COO capacity, he briefed the Unit Director Jacqueline L. on the retaliatory performance plan and coordinated its execution with May F. and Sondes D.; emailed DS/Security on January 27, 2021 flagging Plaintiff as exhibiting "troublying behavior," initiating a security referral directly linked to Plaintiff's protected EEO disclosures; and issued the April 7, 2021 "green light" authorizing May F. to trigger the close-out PSR and PIP with no need to await "fresh episodes." When deposed in June 2023 — with Plaintiff's case actively pending before the EEOC AJ — Michael R. held the position of "Chief EEO Counselor" in an unspecified Agency unit. The CIA thus assigned to an EEO counseling role — a function explicitly designed to protect employees' EEO rights, advise potential complainants, and maintain the neutrality of the counseling stage under 29 C.F.R. § 1614.105 — a principal participant in the retaliatory conduct being adjudicated at that moment. A Chief EEO Counselor advises Agency employees on their rights and is the first point of contact for employees considering EEO complaints. Placing a known

retaliator in that gatekeeping role chills EEO participation by employees who may receive counseling from, or whose matters may be reviewed by, that individual. This supervisory-level structural failure mirrors the Agency-level failure documented in *Harold v. CIA* — confirming that the CIA's non-compliance with EEO independence requirements is not incidental but institutional.

**F. Anticipated State Secrets Defense and Plaintiff's Preemption**

53. Plaintiff anticipates that Defendant will invoke the state secrets privilege under *United States v. Reynolds*, 345 U.S. 1 (1953), to shield discriminatory and retaliatory workplace conduct from judicial review. Such an invocation would be legally unfounded, procedurally improper, and constitutionally suspect under settled Fourth Circuit and Supreme Court precedent.

54. The state secrets privilege is evidentiary, not jurisdictional. *Reynolds* authorizes the government to withhold specific items of evidence whose disclosure would present a reasonable danger to national security — it does not divest courts of subject matter jurisdiction over Title VII claims, bar entire causes of action, or substitute for merit review. *Weinberger v. Catholic Action of Hawaii*, 454 U.S. 139, 146–47 (1981). No Supreme Court decision has held that the state secrets privilege extinguishes a federal employee's express statutory right to sue under 42 U.S.C. § 2000e-16. The Supreme Court's most recent treatment of the doctrine confirms its evidentiary character and does not endorse automatic dismissal: in *FBI v. Fazaga*, 595 U.S. 344 (2022), the Court addressed the state secrets privilege as a rule of evidence and declined to hold that its assertion compels dismissal, remanding for further proceedings. *Fazaga* arose from

foreign-intelligence surveillance — a context far removed from this employment-retaliation action, which rests entirely on an unclassified administrative record.

55. In the Fourth Circuit — which encompasses this Court — dismissal of an entire action on state secrets grounds is permissible only when the "very subject matter" of the action is itself a state secret, such that litigating the claim inherently requires disclosure of protected national security information regardless of which evidence is used. *El-Masri v. United States*, 479 F.3d 296, 303–06 (4th Cir. 2007). The very subject matter of this action is not a state secret. It is discriminatory and retaliatory workplace management, the manipulation of administrative EEO proceedings, fabricated personnel records, false affidavits, and structural conflicts of interest in OEEO/OGC — conduct documented in an unclassified 2,213-page Report of Investigation. Executive Order 13526, § 1.7 independently establishes the impropriety of the challenged withholdings: that Order expressly prohibits classifying, or failing to declassify, information to conceal violations of law or to prevent embarrassment to an agency. Agency emails documenting OGC's coordination of adverse performance actions are not intelligence sources or methods; their continued redaction and privilege designation serve to shield potential Title VII violations from judicial scrutiny, not to protect national security interests.

56. *Sterling v. Tenet*, 416 F.3d 338 (4th Cir. 2005), on which Defendant will likely rely, is materially distinguishable. In *Sterling*, dismissal was required because the claim specifically concerned the plaintiff's fitness for classified undercover intelligence operations — the CIA's core national security function. Here, Plaintiff's claims concern: supervisors' discriminatory suppression of Taiwanese American identity; unexplained placement and rescission of a performance document (90-Day AWP); fabrication of

Plaintiff's protected bases in EEO filings; twenty-one ex parte emails from supervisors to a PSR rebuttal adjudicator; a post-separation security clearance inquiry as retaliation; and fraudulent affidavit testimony in federal administrative proceedings. None of these acts constitutes an "intelligence activit[y] of the United States." Id. at 347. Under *Sterling* itself, dismissal is warranted only where privileged evidence is essential — to the plaintiff's prima facie case or to a valid defense — and no protective measure permits adjudication. That condition is absent here: Plaintiff's prima facie case rests entirely on unclassified, already-produced evidence (see ¶ 57), so the privilege cannot bar it, and Defendant may not wield the privilege as both shield and sword to manufacture a defense that the unclassified record refutes. The same is true of *Abilt v. CIA*, 848 F.3d 305 (4th Cir. 2017): there the plaintiff served in the CIA's National Clandestine Service, the facts of his employment were pervaded by classified information, and the Agency could not defend its actions without privileged material concerning his covert assignments. Here, by contrast, the Agency has already presented its defense — its asserted legitimate, non-retaliatory reasons for the challenged actions — entirely on the unclassified record, through the 2,213-page Report of Investigation, the depositions of five named management officials, and full summary-judgment briefing, none of which invoked the state secrets privilege. Because neither Plaintiff's prima facie case nor the Agency's defense depends on privileged information, the dispositive premise of *Sterling* and *Abilt* — that privileged evidence is so central that the litigation cannot proceed without risking its disclosure — is absent here. The Government's likely reliance on *Wikimedia Foundation v. NSA*, 14 F.4th 276 (4th Cir. 2021), and *General Dynamics Corp. v. United States*, 563 U.S. 478 (2011), fares no better: those decisions require dismissal only where

continued litigation would itself risk disclosure of protected information, or where privileged evidence is essential to a claim or defense — conditions absent here, because the entire matter has already been adjudicated on the unclassified record the Agency produced, and neither Plaintiff's claims nor the Agency's defense depends on privileged material.

57. All Counts rest on evidence already produced in the unclassified administrative record: (a) the EEO Investigator's own finding of per se reprisal (ROI at 52); (b) the twenty-one ex parte supervisory emails; (c) Jacqueline L.'s demonstrably false affidavit, directly contradicted by Agency documents; (d) the January 26, 2021 security referral of Plaintiff's EEO disclosures; (e) the April 22, 2021 post-separation inquiry to formally trigger the PIP in Plaintiff's close-out PSR; and (f) the RMOs' disclosure of Plaintiff's EEO complaint and its linkage to performance evaluations (ROI at 52, 2055). None of this evidence implicates classified intelligence operations. This Court can adjudicate all claims entirely on the unclassified record.

58. Provenance of the documentary record. Every documentary exhibit and record citation in this Complaint derives from materials disclosed to Plaintiff by the U.S. Equal Employment Opportunity Commission through its Freedom of Information Act and Section 83 processes (see 29 C.F.R. § 1610.17(d); EEOC Compliance Manual § 83), released to Plaintiff for the express purpose of pursuing this civil action. The Complaint relies solely on these officially released, unclassified materials and on the public decisions of the EEOC, and discloses no classified information.

59. Defendant's own conduct in administrative proceedings estops reliance on state secrets privilege. Having successfully invoked national security authority throughout the

administrative process to withhold all six deposition transcripts, deny over 1,000 pages of discovery, impose on-site-only document review, and redact substantial portions of the ROI, Defendant cannot now invoke that same privilege to argue Plaintiff cannot prove her case without the suppressed evidence. To permit a party simultaneously to suppress evidence and obtain dismissal for want of that evidence would reward bad faith, immunize fraudulent conduct from judicial review, and subvert the administration of justice — precisely the evil condemned in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944). Moreover, CIA's invocation of national security to justify these administrative suppression measures presents a dispositive fork from which Defendant cannot escape. If the underlying matters involve a genuine national security nexus — as CIA's own redactions of the 2,213-page ROI and withholding of deposition transcripts affirmatively represent — then Plaintiff's EEO disclosures qualify for reprisal protection under the Intelligence Community Whistleblower Protection Act ("ICWPA"), 50 U.S.C. § 3033(k)(5), and Defendant cannot simultaneously invoke that same nexus to defeat Plaintiff's only available remedies in federal court. If the matters do not involve national security, then the redactions and withholdings were pretextual suppression of exculpatory evidence, not legitimate security measures — a position that triggers adverse inferences and precludes any claim of good faith. CIA's inconsistent invocations of national security authority, pressed in whichever direction is tactically convenient, constitute arbitrary and capricious government conduct that cannot be sustained. See *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (by analogy). Independently, the estoppel is confirmed by Defendant's own litigation conduct: for more than two years, it litigated this matter entirely on an unclassified basis

— producing a 2,213-page Report of Investigation, deposing five named responsible management officials, and briefing summary judgment to conclusion — without ever invoking the state secrets privilege. Having adjudicated the merits on an unclassified record, Defendant cannot assert the privilege for the first time in this Court without, at minimum, forfeiting it.

60. Where the government withholds evidence, courts may draw adverse inferences against the withholding party rather than dismiss the action. See *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998); *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) (courts' inherent power to remedy bad faith conduct). To the extent Defendant contends that withheld deposition transcripts or discovery would have established legitimate, non-discriminatory justifications for adverse actions, the adverse inference doctrine requires the opposite conclusion: that the withheld evidence would have corroborated Plaintiff's claims.

61. Congress expressly extended Title VII's anti-discrimination and anti-retaliation protections to federal employees, including CIA employees, through 42 U.S.C. § 2000e-16. This reflects Congress's deliberate judgment that employment discrimination claims must be justiciable even within the Intelligence Community. A blanket state secrets dismissal would nullify Congress's express statutory mandate in derogation of the clear statement rule. See *Webster v. Doe*, 486 U.S. 592, 603 (1988) ("[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear."). Congress's intent to provide judicial review for Title VII claims — including against the CIA — is clear on the face of § 2000e-16.

62. Any formally asserted state secrets privilege must satisfy the procedural requirements of *Reynolds*: a formal invocation by the head of the department — here, the Director of the Central Intelligence Agency — in a personal affidavit that identifies specific items of evidence and articulates why their disclosure presents a particularized, non-speculative danger to national security. *Reynolds*, 345 U.S. at 7–8. A categorical invocation covering the entire administrative record, all personnel decisions, or all workplace conduct is legally insufficient. This Court retains authority to review any claimed privileged documents in camera to determine whether the privilege is properly invoked and to assess whether non-privileged portions are segregable. *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1201 (9th Cir. 2007). The court's independent duty to determine whether the privilege has been validly invoked, and to segregate any non-privileged material rather than defer to the Executive's assertion at face value, is established in this Circuit. *El-Masri*, 479 F.3d at 304–06.

**G. FOIA and Privacy Act Requests and the Agency's Non-Compliance**

63. In January 2026, Plaintiff and her designated representative submitted comprehensive Freedom of Information Act (FOIA) and Privacy Act requests to both the CIA and the EEOC seeking the complete complaint file in Agency Case No. 21-21, including the Report of Investigation, Agency submissions, deposition transcripts, and all correspondence between CIA and EEOC components. These requests were assigned EEOC FOIA Nos. 820-2026-003117 and 820-2026-003866 (received January 7 and 12, 2026, respectively), and CIA FOIA/Privacy Act requests P-2026-00294 and P-2026-00398 (received January 7 and February 4, 2026, respectively; certified mail January 6, 2026).

64. On February 11, 2026, EEOC issued a final determination on FOIA No. 820-2026-003866 stating that Plaintiff's request was "fully granted" and directing her to the EEOC Public Portal. The determination contained the following dispositive statement: "to the extent any records responsive to your request are not present in the Public Portal, they are not in the custody, possession, or control of the Commission." The Public Portal contained only documents uploaded by Plaintiff or her representative. No records originating from the CIA appeared in the Portal — not the ROI, not the Agency's submissions at the hearing stage, not the Agency's appellate record, not any correspondence between CIA and EEOC.

65. The EEOC's FOIA response establishes that CIA never submitted the complaint file to EEOC as required by federal regulation. Under 29 C.F.R. § 1614.108(h), the Agency was required to transmit the complaint file to EEOC within fifteen (15) days of receipt of the hearing request — i.e., by approximately July 14, 2022, following EEOC's June 29, 2022 hearing notice. Under 29 C.F.R. § 1614.403 and EEOC Management Directive 110, Chapter 9, the Agency was required to submit the complete record to OFO within thirty (30) days of the January 19, 2024 appeal acknowledgment. Neither submission appears in EEOC's custody. EEOC's own FOIA response confirms that these mandatory regulatory submissions were never made.

66. The absence of CIA's complaint file from EEOC's custody has a devastating implication: the AJ's November 28, 2023 Decision Without Hearing and OFO's September 22, 2025 appellate decision were both rendered on an incomplete, one-sided record that contained only submissions by or on behalf of Plaintiff — and the Agency's own advocacy materials submitted ex parte outside the formal record. EEOC is required by 29 C.F.R. §

1614.108(b) to develop and maintain an "impartial and appropriate factual record." Adjudicating without the Agency's mandatory submissions in custody — while simultaneously crediting the Agency's extra-record advocacy verbatim — is structurally inconsistent with impartial review and constitutes independent due process grounds for this action.

67. Plaintiff timely appealed the EEOC FOIA determination on February 18, 2026 (FOIA Appeal No. 820-2026-000154A), requesting:

**(a)** confirmation of whether CIA ever submitted the complaint file;

**(b)** disclosure of any EEOC-internal compliance records, enforcement notices, or docket entries regarding CIA's non-submission; and

**(c)** disclosure of any EEOC enforcement actions taken against CIA for failure to comply with § 1614.108(h) and § 1614.403 deadlines. EEOC FOIA denied Plaintiff's appeal on April 1, 2026, but states that "we again advise you that any records from the complaint files you identified in your request that were under the custody and control of the EEOC were provided to you in connection with the initial determination on February 11. Certain records that originated with the Agency that conducted your EEO investigation are not considered EEOC records, but Agency records, and you should contact the Agency to request copies of those." The absence of any EEOC enforcement action against CIA for its non-compliance further evidences the structural conflict of interest and institutional bias permeating these proceedings.

68. The FOIA record independently forecloses CIA's anticipated state secrets defense. A government party that withholds an entire complaint file from the adjudicating body — in

violation of its own mandatory regulatory obligations — cannot credibly invoke state secrets privilege in federal court to prevent disclosure of the same file. The state secrets doctrine is designed to protect genuinely sensitive information from compelled judicial disclosure; it does not provide a mechanism to retroactively launder regulatory non-compliance, conceal non-merits adjudication, or shield from accountability documents that the government strategically chose never to place before the administrative adjudicator. CIA's own conduct — submitting selective advocacy to the AJ while withholding the formal record — confirms that the underlying dispute is a management and personnel dispute, not a matter of intelligence sources or methods.

## VI. CLAIMS FOR RELIEF

### COUNT I

### Retaliation

(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-3, 2000e-16)

69. Plaintiff incorporates by reference the allegations of all preceding paragraphs.

70. Plaintiff engaged in activity protected under Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), which protects both opposition to discrimination and participation in the EEO process. Under the opposition clause, Plaintiff's protected activity began no later than late 2019 and January 2020, when she reported and objected to the national-origin and race-based harassment through her chain of command and the Agency's anti-harassment channels; opposition need not take the form of a formal charge and is protected where based on a reasonable, good-faith belief that the employer has violated

Title VII. *Crawford v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271 (2009); *DeMasters v. Carilion Clinic*, 796 F.3d 409 (4th Cir. 2015). Under the participation clause, Plaintiff's protected activity further included contacting an EEO Counselor, filing informal and formal EEO complaints, and participating in the ensuing EEO proceedings as a complainant.

71. Defendant took materially adverse actions against Plaintiff because of her protected EEO activity. See *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (adverse action is one that would dissuade a reasonable worker from making or supporting a discrimination charge).

72. The following acts each constitute retaliation, independently sufficient under *Burlington Northern*, and each also constitutes per se reprisal under EEOC doctrine:

**(a)** the January 26, 2021 disclosure of Plaintiff's EEO complaint to a manager outside her chain of command (Michael R.), and that manager's referral the very next day — January 27, 2021 — flagging Plaintiff to CIA security as a "disgruntled" officer, initiating a security file linked directly to her EEO activity;

**(b)** May F.'s and Sondes D.'s twenty-one (21) ex parte emails to PSR Rebuttal Adjudicator GJ on or about June 29–30, 2021;

**(c)** May F.'s post-separation inquiry on April 22, 2021 about revoking Plaintiff's security clearance (Agency Discovery Production at 215) — six days after Plaintiff's April 16, 2021 resignation;

**(d)** imposition of $16,401 in deposition costs at per-page rates exceeding the GSA contract ceiling by more than 100 percent, pleaded as an independently adverse action and, in the alternative, as evidence of retaliatory animus;

**(e)** on-site-only OGC document access restriction imposed asymmetrically on Plaintiff, pleaded in the same manner as (d); and

**(f)** RMOs' disclosure of Plaintiff's EEO complaint to unauthorized parties and their express linkage of that complaint to Plaintiff's performance evaluation (ROI at 52), each independently constituting retaliation under *Burlington Northern*.

73. The broader pattern of post-separation security coordination documented (Agency Discovery Production at 215) (April 21–30, 2021) — initiated six days after Plaintiff's April 16, 2021 constructive discharge and continuing for at least ten days thereafter — reflects a coordinated effort to damage Plaintiff's security clearance standing, future employment eligibility, and reputation within the Intelligence Community. Post-separation pursuit of clearance revocation without a legitimate security basis, conducted in the weeks immediately following an EEO-related separation, is reasonably likely to deter current and prospective Agency employees from exercising EEO rights, satisfying the *Burlington Northern* deterrence standard. 548 U.S. at 68. See also *Green v. Brennan*, 578 U.S. 547, 555 (2016) (post-resignation adverse effects remain actionable).

74. The Agency's own OEEO investigator explicitly identified the disclosures to FY2021 PSR Rebuttal Adjudicator GJ as a per se reprisal violation at ROI at 52. GJ was the Agency official assigned to adjudicate Plaintiff's FY2021 Performance Summary Report (PSR) rebuttal — not an EEOC or administrative EEO adjudicator. All references to "GJ"

in this Complaint denote his role as the Agency's internal FY2021 PSR rebuttal adjudicator. One email in the twenty-one-email chain, dated June 29, 2021, expressly linked Plaintiff's EEO complaint to a performance timeline entry for "Feb 2021" noting "non-professional language" — demonstrating that the disclosures occurred in a performance adjudication context without any legitimate need-to-know. This investigator-identified per se violation, documented atwas never addressed on the merits by the AJ or OFO. An administrative finding that ignores the Agency's own investigator's per se violation conclusion lacks any legitimate basis for judicial deference. See *Chandler v. Roudebush*, 425 U.S. 840 (1976). The record further reflects that GJ did not disclose these communications voluntarily: he produced the ninety-five (95) attachments — the supervisory emails sent to him by May F. and Sondes D. in his PSR-adjudicator role — to the EEO investigator only after executing his signed affidavit and being compelled to do so, undermining his assertion that he first learned of Plaintiff's EEO activity on July 9, 2021 and confirming the absence of good faith.

75. OGC counsel's guidance to RMOs May F. and Michael R. to deny Plaintiff official time for EEO activities — while OGC simultaneously served as the Agency's advocate in those same proceedings — constitutes per se retaliation. Under 29 C.F.R. § 1614.605, a federal complainant is entitled to a reasonable amount of official time to prepare and present an EEO complaint. The Agency provided zero official time from January through April 2021. Where OGC itself directs that denial while defending the Agency against the complainant's charges, the conduct satisfies the deterrence standard of *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), and constitutes per se reprisal. See *Terisa B. v. Dep't of Defense*, EEOC Appeal Nos. 0120180570 et al. (2019).

76. On January 14, 2021, within hours of Plaintiff's notification of intent to file an EEO complaint, Responsible Management Officials disseminated Plaintiff's protected EEO activity to the Unit management at least ten (10) separate emails. On January 22, 2021 — the same day Plaintiff submitted her informal complaint to OEEO — supervisor May F. simultaneously fabricated a backdated "Performance Timeline [CP]" and distributed it to the Unit front office. The same-day disclosure to multiple unauthorized recipients — combined with the simultaneous fabrication and distribution of a retaliatory performance record — constitutes an independent act of per se retaliation under *Burlington Northern*. A reasonable employee who saw that protected EEO disclosures were immediately routed to security and management would be deterred from further EEO participation.

77. EEOC precedent uniformly confirms that the conduct described herein constitutes per se reprisal. *Will K. v. U.S. Postal Service*, EEOC No. 2020000109 (Oct. 2020) (referencing EEO activity in performance documents constitutes per se reprisal). *Terisa B. v. Dep't of Defense*, EEOC Appeal Nos. 0120180570 et al. (2019) (supervisory comments implying an EEO complaint caused extra work and stress, or threats of adverse action following protected activity, are per se reprisal). *Albert H. v. Dep't of Justice*, EEOC No. 0120171659 (2018) (agency attorney directing intrusive or burdensome actions based on EEO pleadings constitutes direct evidence of reprisal, bypassing *McDonnell Douglas*). *Mindy O. v. Dep't of Homeland Security*, EEOC No. 0120141506 (2016) (group statements warning of prolonged discipline for EEO complaints equal per se reprisal). Each of these fact patterns — referencing EEO activity in performance records, OGC imposing financial burdens on a complainant, supervisory threats following protected filings — is directly replicated in the documented CIA conduct.

78. The OFO's sole stated ground for rejecting Plaintiff's per se reprisal claim — that her managers made no remarks about her protected activity that were "negative" or likely to deter protected activity — misstates the governing standard. Per se reprisal requires no hostile, critical, or deterrent statement; it requires only conduct reasonably likely to have a chilling effect on the EEO complaint process. See *Ivan V. v. Dep't of Veterans Affairs*, EEOC Appeal No. 0120141416 (June 9, 2016) ("[w]hen a supervisor's behavior has a potentially chilling effect on the use of the EEO complaint process[,] ... the behavior is a per se violation"); *Orval T. v. Dep't of Homeland Security*, EEOC Appeal No. 2020001742 (Sept. 13, 2021) ("[t]here is no requirement that a supervisor must pressure a complainant to drop an EEO complaint or that a supervisor's statement must be hostile or critical to create a chilling effect"). The disclosures of Plaintiff's protected activity, the January 27, 2021 security referral, the compelled EAP examination, and the denials of official time alleged above each satisfy this standard irrespective of whether any Responsible Management Official voiced overt hostility.

79. The Agency's invocation of so-called "Vegas Rules" constitutes a further act of per se reprisal. After Plaintiff reported harassment in early 2020, the Unit front office management conveyed to Plaintiff that what was discussed within the team "should remain within the team," and on February 13, 2020 May F. disclosed Plaintiff's protected EEO activity to the Unit front office management. An instruction discouraging discussion of workplace complaints, coupled with the lateral circulation of an employee's protected activity, is conduct reasonably likely to deter a reasonable employee from engaging in the EEO process and is therefore per se retaliatory under Burlington Northern.

80. The denial and delay of Plaintiff's earned annual and sick leave sought for medical examination and treatment (see ¶¶ 37, 38a), imposed closely following her protected opposition to harassment and her EEO activity and while the Agency approved far longer leave for similarly situated employees, constitutes an independent retaliatory adverse action. The denial also departed from the Agency's own leave practice and from its performance-management obligations under ODNI Intelligence Community Directive 651 and the CIA Performance Improvement Plan policy (see ¶ 89).

81. The Agency's contention that Plaintiff's May 20, 2021 PSR rebuttal constituted the first EEO disclosure to the adjudicator is factually false. The January 26, 2021 security referral predates the May 20 rebuttal by 114 days. FY2021 PSR Rebuttal Adjudicator GJ (GJ) was not yet assigned to adjudicate Plaintiff's FY2021 PSR rebuttal as of May 20, 2021 — that assignment occurred in or around June 2021. GJ's role was to adjudicate the Agency's internal PSR rebuttal process, not the EEO complaint; he is not an EEOC-appointed or administrative law judge adjudicator. A PSR rebuttal filed in the formal human-resources record is categorically distinct from a direct disclosure to the assigned PSR rebuttal adjudicator, and the supervisory ex parte emails transmitted to GJ in his adjudicatory role constituted a per se violation of the anti-reprisal prohibition.

82. There is a direct causal nexus between Plaintiff's protected activity and each retaliatory act, and the temporal proximity is specific and striking: the abrupt workload increase and reassignment came within ten working hours of Plaintiff's October 22, 2020 rebuttal victory; the CIA-security flag came the day after her EEO complaint was disclosed outside her chain of command on January 26, 2021; and the denial of her medically necessary leave followed closely upon her harassment reports and EEO activity. That

proximity, combined with direct evidence of security flagging and ex parte communications, establishes both direct and cat's-paw liability. See *Staub v. Proctor Hospital*, 562 U.S. 411 (2011). Any but-for requirement for retaliation is satisfied by this proximity. See *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

83. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff suffered the damages set forth above.

**Retaliatory Obstruction of the EEO Process and Structurally Compromised Administrative Proceedings (In Further Support of Count I)**

(42 U.S.C. §§ 2000e-3(a), 2000e-16; objections preserved under U.S. Const. amend. V and 29 C.F.R. § 1614.405)

84. In further support of Count I, Plaintiff alleges that Defendant's conduct of the administrative process itself constituted retaliation. Each act below, insofar as committed by Defendant's agents, was materially adverse under *Burlington Northern* because it would dissuade a reasonable employee from making or supporting a charge of discrimination; collectively, these acts constituted a campaign of retaliatory obstruction of the EEO process. The same conduct independently grounds this Court's de novo, non-deferential review, adverse inferences against Defendant, and sanctions.

85. Plaintiff further preserves — as documented in her November 21, 2025 Notice of Preservation of Due Process Claims — her objections to the administrative proceedings under *Mathews v. Eldridge*, 424 U.S. 319 (1976): Plaintiff possessed protected property and liberty interests in her continued federal employment and in the integrity of

proceedings determining her legal rights, and was entitled to meaningful notice and a meaningful opportunity to be heard before adverse administrative action.

86. The following violations, independently and collectively, constituted retaliatory obstruction and deprived Plaintiff of a fair administrative forum:

**(a)** OFO's acceptance of the CIA's untimely November 17, 2025 Opposition — 28 days after the RFR, exceeding the 20-day deadline under 29 C.F.R. § 1614.405(c) — without ruling on Plaintiff's Motion to Strike and without affording Plaintiff equivalent relief;

**(b)** the AJ's verbatim incorporation of CIA OGC's summary judgment briefing as independent findings — confirmed by the AJ's own statement, "I adopt an *[sic]* incorporate by reference the analysis contained in the Agency's Motion and Reply brief as the operable analysis for this Decision" — in violation of 29 C.F.R. § 1614.109(g) and Fed. R. Civ. P. 56 standards incorporated via EEOC MD-110, Ch. 9 § VI.A;

**(c)** CIA OEEO's structural lack of independence from OGC, creating an institutionalized conflict of interest that tainted investigation, hearing, and appellate review;

**(d)** asymmetric discovery conditions — including on-site-only document access, a $16,401 sole-source deposition charge at per-page rates exceeding the GSA contract ceiling by more than 100 percent, and the June 15, 2023 physical removal of Plaintiff's representative from Agency OEEO premises — that systematically impaired Plaintiff's ability to contest Agency evidence;

**(e)** prior counsel's withdrawal driven by security clearance reprisal concerns and concurrent CIA client conflicts, itself a foreseeable consequence of Agency retaliatory conduct;

**(f)** CIA OGC's submission of materially false statements in the Motion for Summary Judgment — including denial of documented facts in the administrative record, mischaracterization of the per se reprisal finding identified by the Agency's own OEEO investigator at ROI at 52 as a "new claim," and selective invocation of attorney-client privilege to suppress RMO-OGC coordination emails that appeared unredacted in the ROI — constituting fraud on the tribunal that taints all adverse findings downstream. See *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944); and

**(g)** CIA OGC's assertion of attorney-client privilege over management emails documenting retaliatory coordination with supervisors—without the privilege logs required under MD-110, Ch. 7, § IV.D.3 and the FRCP 26(b)(5) analogue—and OGC's application of inconsistent and non-compliant redaction designations in violation of EO 13526 § 1.7 and MD-110 § 6-21, which suppressed material evidence of OGC's impermissible pre-hearing involvement in Plaintiff's EEO proceedings and denied Plaintiff equivalent access to the complaint record.

87. The AJ granted summary judgment (Exhibit C) notwithstanding more than thirty (30) disputed material facts documented in Plaintiff's Opposition, including the investigator's own per se reprisal finding (ROI at 52), the twenty-one ex parte emails to PSR Rebuttal Adjudicator GJ, Jacqueline L.'s demonstrably false affidavit, and Huey L.'s fabricated reports. Summary judgment is inappropriate where a reasonable factfinder could return a verdict for the non-moving party on any genuine dispute of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The AJ conducted no independent factual analysis, resolved no disputed facts, and wrote no analysis of the per se reprisal finding — in direct violation of 29 C.F.R. § 1614.109(g) and Fed. R. Civ. P. 56.

88. CIA's OEEO was required under EEO Management Directive 110, Chapter 1, § II.A, to report directly to the Agency head in order to maintain independence from conflicting institutional interests. Instead, the OEEO Director reported to the Agency's own Chief Operating Officer (CIA/COO). An EEO office whose Director reports to the CIA/COO overseeing both the OEEO and OGC cannot provide impartial investigation, hearing support, or appellate record preparation. This structural defect — independently confirmed in *Harold v. CIA*, No. 1:25-cv-04086 (D.D.C. filed Nov. 20, 2025) — is a due process violation that infected every stage of administrative proceedings. On November 4, 2020, Michael R. was still serving as a department chief within the Unit (he was not appointed the Unit's Chief Operating Officer until approximately January 18, 2021) when he participated in communications with the Unit Director Jacqueline L. and formulated the retaliatory performance plan with Plaintiff's supervisors, May F. and Sondes D. His involvement on November 4, 2020, was as the designated RMO for prior EEO complaints within the Unit, a peer-level department chief outside Plaintiff's direct management chain — not yet in the COO supervisory role he would assume more than two months later. When Michael R. was deposed in June 2023, he held the position of Chief EEO Counselor in an unspecified unit — a placement whose implications for the Agency's EEO structural independence are developed in ¶52 above.

89. The Advanced Work Plan imposed on Plaintiff on December 3, 2020, and the Performance Improvement Plan triggered post-separation on or after April 30, 2021, were issued in violation of the procedural prerequisites mandated by ODNI Intelligence Community Directive 651 (ICD 651) — the governing performance management framework for CIA civilian workforce — and the Agency's performance management

regulation. ICD 651 requires, before initiating a formal performance improvement action: (1) documented written notice of specific deficiencies against measurable standards; (2) a reasonable opportunity to improve; and (3) a performance summary establishing "not meeting expectations" before a PIP commences. None of these steps was followed. Agency OGC withheld ICD 651 compliance documents in defiance of an AJ Discovery Order dated June 15, 2023, preventing Plaintiff from establishing the regulatory framework at the hearing stage. The procedural violations of ICD 651 constitute independent procedural injuries supporting Count I and this Court's de novo, non-deferential review.

90. Under 29 C.F.R. § 1614.605, federal complainants are entitled to a reasonable amount of official time to prepare and present EEO complaints and to respond to Agency discovery requests. CIA OGC counseled supervisors May F. and Michael R. to provide Plaintiff zero official time from January through April 2021 while simultaneously conducting discovery and preparing summary judgment materials. The categorical denial of all official time, guided by the same OGC defending the Agency, eliminated a mandatory procedural protection to which Plaintiff was entitled by regulation, constituting independent retaliatory obstruction and a preserved objection under *Mathews v. Eldridge*, 424 U.S. 319 (1976).

91. Agency OGC's repeated conflation of Plaintiff's national origin (Taiwan) and race (Hoklo Taiwanese) with 'Chinese' across every adversarial filing from discovery through reconsideration independently constituted a materially adverse act of retaliatory obstruction. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). By forcing Plaintiff to rebut these misrepresentations across counseling, discovery responses,

MSJ opposition (generating more than 100 pages of additional rebuttal), appeal briefs, supplementary appeal briefs, and reconsideration — while simultaneously requiring Plaintiff to affirmatively establish that Taiwanese American identity constitutes a cognizable protected characteristic at all — OGC imposed an onerous litigation burden that chilled and deterred Plaintiff's EEO participation. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015); *Village of Freeport v. Barrella*, 814 F.3d 594 (2d Cir. 2016). This tactic, documented in Agency Discovery Responses (May 17, 2023) and MSJ/Reply filings (August–October 2023), constitutes an independent ground of retaliatory obstruction under 42 U.S.C. § 2000e-3(a).

92. In August–September 2023 — during the active EEOC hearing phase — the Agency transferred former OGC paralegal JW to OEEO and immediately designated her as the contact point for Plaintiff's on-site record review and note redaction, despite her prior designation as OGC's adversarial representative in this matter since October 11, 2021. Her reassignment afforded OGC indirect real-time visibility into Plaintiff's litigation strategy while simultaneously delaying Plaintiff's access to her own evidentiary notes: notes submitted August 31 and September 14, 2023 were not returned until September 26, 2023 — after the September 18 MSJ opposition deadline; notes submitted October 13, 2023 were not returned until January 8, 2024, just before the appeal petition deadline. The JW reassignment is an independent retaliatory act and gross mismanagement under 5 U.S.C. § 2302(b)(8) and PPD-19 (2012), corroborating Plaintiff's claim that the administrative process itself constituted retaliation. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

93. The administrative process was so fundamentally compromised that any findings adverse to Plaintiff are entitled to no deference and should be reviewed de novo. Under *Chandler v. Roudebush*, 425 U.S. 840 (1976), Plaintiff is entitled to de novo adjudication of her Title VII claims in this Court; the defects catalogued in this section are pleaded in support of that posture — and of adverse inferences and sanctions — together with Plaintiff's preserved constitutional objections, rather than as a freestanding constitutional claim. The RFR proceedings provide additional confirmation of this posture: OFO's April 6, 2026 denial violated 29 C.F.R. § 1614.403(d) — which bars consideration of submissions filed after the applicable period — by crediting and adopting the Agency's "second appeal" characterization from its untimely November 17, 2025 Opposition, a filing that was procedurally improper under either timeline interpretation (untimely by eight days from Plaintiff's October 20 RFR filing, or premature by three days from OFO's November 20 docketing notice to the Agency). OFO then dismissed Plaintiff's 20-page, substantive RFR Brief — which raised five discrete grounds, including the multi-generation verbatim derivation chain, per se reprisal, bases alteration, constructive discharge analysis error, and the substantial impact of permitting CIA's 467-day ROI delay and $16,401 mandated deposition costs to proceed without sanction — in two conclusory sentences, without addressing any substantive ground raised.

94. As a direct and proximate result of these violations, Plaintiff was denied a fair forum and suffered loss of employment, income, career opportunities, physical harm, and emotional distress.

## COUNT II

## Hostile Work Environment

(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, 2000e-3, 2000e-16)

95. Plaintiff incorporates by reference the allegations of all preceding paragraphs.

96. Defendant, through the acts of CIA supervisors, managers, and officials, created and maintained a work environment hostile and abusive toward Plaintiff. Animus toward Plaintiff's national origin (Taiwan) and race (Taiwanese, of Hoklo ancestry) triggered the initial harassment and unequal treatment. But after Plaintiff opposed that conduct through protected activity — reporting harassment through her chain of command and the Agency's anti-harassment channels beginning in January 2020, and thereafter through the EEO process — her supervisors did not abate the harassment; they escalated and sustained it because of that protected activity. The hostile environment is therefore actionable both as status-based harassment under 42 U.S.C. § 2000e-2 and as a retaliatory hostile work environment under 42 U.S.C. § 2000e-3(a).

97. The hostile conduct was sufficiently severe and pervasive to alter the terms, conditions, and privileges of Plaintiff's employment and to create an objectively and subjectively abusive work environment.

98. Specific acts include, without limitation:

**(a)** use of "Fukian" — an ancestral-Chinese-province epithet used to deny her Taiwanese identity — directed at Plaintiff, a Taiwanese American instructor;

**(b)** unexplained placement and rescission of the AWP;

**(c)** differential treatment in overtime and awards compared to a non-EEO-active comparator;

**(d)** ex parte supervisory communications with the PSR rebuttal adjudicator;

**(e)** security surveillance and flagging of EEO activity; and

**(f)** alteration of Plaintiff's protected bases to minimize Taiwanese American identity in official proceedings;

**(g)** coworker Huey L.'s July 30, 2020 threatening text message to Plaintiff late at night — "Don't get yourself hurt";

**(h)** Huey L.'s December 10, 2020 disruption of Plaintiff's class in the presence of students;

**(i)** supervisors' knowing adoption of Huey L.'s false reports as factual predicate for adverse employment actions, imputing his discriminatory animus through the cat's paw doctrine, *Staub v. Proctor Hospital*, 562 U.S. 411 (2011).;

**(j)** management referral of Plaintiff to the Employee Assistance Program (EAP) on September 4, 2020 — a stigmatizing act that recasts Plaintiff's EEO-protected opposition as a psychological or conduct issue;

**(k)** manager May F.'s August 2020 advocacy for Plaintiff's termination without documented cause — more than three months before the formal AWP — establishing that the performance narrative was predetermined;

**(l)** systematic denial of earned annual/sick leave for medical appointments and official time for EEO activities during March–April 2021, coordinated with OGC guidance restricting official time;

**(m)** escalating and asymmetric work assignment burden — same course level for four consecutive rotations, additional students, denial of overtime — not applied to non-EEO-active comparators;

**(n)** the cumulative hostile conditions experienced by Plaintiff while suffering an undiagnosed serious medical condition during employment, which required hospitalized surgery and which contributed to Plaintiff's constructive discharge on April 16, 2021; and

**(o)** post-separation trigger of Plaintiff's close-out Performance Improvement Plan (PIP) on or after April 30, 2021 — activated only after Plaintiff's departure, once the "not meeting expectations" option became available 90 days after updating Plaintiff's KJE entry in the week of January 25, 2021 — confirming the PIP was designed as a termination instrument rather than a legitimate performance measure.

99. The performance manipulation timeline — EAP stigmatization (September 4, 2020), predetermined AWP (December 3, 2020), fabricated "Performance Timeline" backdated to August 2020 (January 22, 2021), leave denial for medical appointments and lack of official time for EEO engagements (March–April 2021), and post-departure PIP trigger (April 30, 2021) — constitutes a sustained, coordinated pattern that was both objectively hostile and subjectively experienced as such by Plaintiff. This pattern satisfies the severe or pervasive standard under *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993), and *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998). The performance manipulation mechanism operationalized discriminatory animus against Plaintiff's Taiwanese American identity and EEO-protected activity into adverse employment actions, bridging Count II's hostile work environment theory with the retaliation and

disparate treatment theories in Counts I and IV. For the retaliatory branch, the same course of conduct satisfies the standard for a retaliatory hostile work environment — conduct severe or pervasive enough to dissuade a reasonable worker from engaging in protected activity. *Laurent-Workman v. Wormuth*, 54 F.4th 201 (4th Cir. 2022) (applying *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

100. *Staub v. Proctor Hospital*, 562 U.S. 411, 422 (2011), imposes employer liability when a biased non-decisionmaker's discriminatory reports are a proximate cause of an adverse employment action taken by a supervisory decisionmaker who relies on those reports. Huey L. — a GS-11 coworker with no supervisory authority and who self-identified as "Taiwanese Chinese" reflecting a pro-Mainlanders cultural orientation directly antithetical to Plaintiff's Hoklo Taiwanese identity — fabricated a meeting attendance recap on March 29, 2021 enumerating Plaintiff's alleged absences and circulated it to the Unit front office, May F., and Sondes D. Agency RMOs and OGC subsequently relied on Huey L.'s fabrication in the Motion for Summary Judgment. Huey L. was unaware that Plaintiff was on approved leave during some of the periods Huey L. identified, confirming the falsity of those reports. The chain of causation — Huey L.'s discriminatory fabrication → supervisory adoption → adverse PSR and PIP trigger → constructive discharge — establishes cat's paw liability for all Count II acts proximately caused by Huey L.'s conduct.

101. The Agency RMOs' affidavits included in the ROI corroborate the national-origin and racial animus that triggered the harassment, and independently support Plaintiff's disparate-treatment claim (Count IV): five supervisors and coworkers independently conflated Plaintiff's Taiwan national origin and Hoklo Taiwanese race with "Chinese" —

supervisor Anna C. stating "In my mind, she was simply 'Chinese'"; supervisor Sondes D. stating she "believed Complainant to be Chinese"; Michael R. stating he "believed Complainant to be Chinese- or Taiwanese-American"; and May F. characterizing Plaintiff as part of the "Chinese team" while transmitting fabricated performance milestones to Plaintiff's PSR adjudicator. These consistent, unsolicited conflations across five independent supervisory actors constitute direct evidence of the discriminatory animus underlying Plaintiff's claims. See *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987); *Village of Freeport v. Barrella*, 814 F.3d 594, 608–10 (2d Cir. 2016).

102. Plaintiff's constructive discharge on April 16, 2021 was the direct and foreseeable consequence of the hostile work environment documented above. Under *Green v. Brennan*, 578 U.S. 547, 555–56 (2016), constructive discharge requires a plaintiff to show that the discriminatory or retaliatory working conditions were so intolerable that a reasonable person would have felt compelled to resign. The totality of hostile acts from 2019 through April 2021 — surveillance, denial of earned annual and sick leaves for medical examinations and treatments, the coerced EAP referral, the fabricated performance narrative, the AWP without regulatory basis, the escalating PIP threat, the OGC-guided denial of official time and leave, and the post-separation PIP trigger and security interference — collectively rendered Plaintiff's continued employment intolerable. Constructive discharge is thus the ultimate adverse action that directly and causally flows from the hostile work environment, making the full compensatory and equitable remedial framework available for each act listed in ¶98(a)–(o) above.

103. The Agency's own Anti-Harassment Program and ODNI Intelligence Community Policy Guidance 110.2 (Preventing and Responding to Workplace Harassment) imposed

mandatory duties on managers and supervisors to promptly report harassment, to ensure a prompt and impartial inquiry, to protect the complainant from retaliation, and to recuse themselves where personally involved. The responsible officials satisfied none of these duties: they disregarded Plaintiff's repeated harassment reports, opened no impartial inquiry, retaliated against her for reporting, and continued to act against her despite their own involvement. These violations of the Agency's mandatory anti-harassment policies confirm that the hostile work environment is imputable to the Agency.

104. The AJ erred by analyzing each hostile act in isolation rather than considering the totality of circumstances as required by *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993), which commands examination of "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." No single incident need be extreme, where, as here, the conduct spans more than eighteen months, involves multiple actors (May F., Sondes D., Huey L., Michael R., Jacqueline L.), escalates in severity in direct temporal response to each EEO filing, and ultimately compels Plaintiff's constructive discharge. The cumulative weight of the acts enumerated in ¶98(a)–(p) above — collectively, not individually — constitutes an objectively severe and pervasive hostile environment cognizable under Title VII. The severity-and-pervasiveness determination is, moreover, "quintessentially a question of fact" that is particularly unsuited for resolution on summary judgment. See *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957–58 (10th Cir. 2012).

105. Defendant knew or should have known of the hostile conduct and failed to take adequate remedial action.

106. As a direct and proximate result, Plaintiff suffered loss of employment, income, career opportunities, physical harm, and emotional distress.

## COUNT III

## Constructive Discharge

(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, 2000e-3, 2000e-16; *Green v. Brennan*, 578 U.S. 547 (2016))

107. Plaintiff incorporates by reference the allegations of all preceding paragraphs.

108. Under *Green v. Brennan*, 578 U.S. 547, 555–56 (2016), constructive discharge is established where discriminatory or retaliatory working conditions become so intolerable that a reasonable person in the employee's position would feel compelled to resign, and the employee resigns in response. Proof that resignation was the employer's intended outcome is not required. *Id.* at 555.

109. Plaintiff's working conditions were objectively intolerable, as detailed in ¶¶32–37 and ¶102. The record establishes a pre-determined plan to terminate her employment — not legitimate performance management — across the following documented sequence:

**(a)** August 17, 2020: May F. formally requested "termination of [CP's] employment at CIA" in writing to the Unit front office, with fabricated accusations, three months before any formal performance plan;

**(b)** November 4, 2020: Michael R. (then a department chief within the Unit, acting under Jacqueline L.'s direction), provided May F. and Sondes D. with the AWP template and confirmed in writing: "I also walked them through how to strategize the application of KJEs, AWP, and possible PIP to the situation" — establishing that the AWP/PIP pipeline

was designed before any documented performance deficiency;

**(c)** December 3, 2020: AWP delivered to Plaintiff without prior written notice of specific deficiencies, in violation of ICD 651;

**(d)** January 25, 2021: Key Job Elements (KJEs) entered in Plaintiff's record, silently triggering the 90-day evaluation window that would mechanically generate the PIP eligibility threshold — directly concurrent with Plaintiff's formal EEO filing;

**(e)** April 7, 2021: Michael R. (as the Unit's COO) issued the written "green light" authorizing May F. to initiate the close-out PSR that would trigger a PIP, with the express instruction to proceed "now" without "fresh episodes";

**(f)** April 13, 2021: HR transmitted the four-step resignation instructions to Plaintiff while the PSR/PIP process was underway — three days before Plaintiff's April 16 resignation;

**(g)** April 22, 2021: Six days after Plaintiff's resignation, May F. emailed Michael R. inquiring how to activate the "not meeting expectations" option in the PSR system — demonstrating continued post-departure pursuit of the termination pipeline; and

**(h)** April 22, 2021 (Agency Discovery Production at 215): May F. was simultaneously inquiring about revoking Plaintiff's security clearance post-separation — six days after resignation, without any legitimate security basis.

This eight-step sequence establishes that the PIP was a predetermined outcome engineered no later than November 4, 2020, not a legitimate performance response, rendering Plaintiff's working conditions objectively intolerable from the standpoint of any reasonable employee observing the escalating campaign. See also: a coerced psychiatric referral; denial of leave for medical appointments while Plaintiff's physical health deteriorated; and the hostile work environment detailed in Count II.

110. The EEOC AJ applied a heightened "significant harm" standard that improperly excluded the EAP referral, AWP, and predetermined PIP from merits adjudication — errors this Court must correct on de novo review. The correct standard requires only "some harm" to a term or condition of employment, a threshold each step of the predetermined termination pipeline independently satisfies. *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024); *Chandler v. Roudebush*, 425 U.S. 840, 863 n.39 (1976).

111. The intolerability of Plaintiff's working conditions was further compounded by the Agency's denial and delay of her earned annual and sick leave (see ¶¶ 37, 38a) during this same period. As Plaintiff's undiagnosed illness worsened — ultimately requiring emergency treatment and two surgeries (¶ 37) — the responsible officials denied medically necessary leave that the Agency routinely approved for similarly situated employees, characterized her leave request as "lacking team spirit," and simultaneously advanced the predetermined termination pipeline described above. A reasonable employee in Plaintiff's position — confronting deteriorating health, the denial of earned medical leave, and an engineered performance track designed to compel her departure — would have felt compelled to resign. *Green v. Brennan*, 578 U.S. 547, 555–56 (2016).

112. Those conditions were the product of the discrimination and retaliation alleged in Counts I and II, and their cumulative escalation made Plaintiff's resignation the foreseeable — and, as documented in management's own communications, intended — result.

113. Plaintiff's resignation, tendered April 13, 2021 and effective April 16, 2021, was the direct and involuntary consequence of those conditions. The constructive discharge claim was timely exhausted through the April 19, 2021 amendment to Plaintiff's formal administrative complaint.

114. As a direct and proximate result, Plaintiff suffered loss of employment, income, benefits, and career opportunities. Back pay accrued from April 16, 2021, subject to reduction for interim earnings under 42 U.S.C. § 2000e-5(g)(1), in amounts to be proven at the remedies stage.

## COUNT IV

### Disparate Treatment Based on National Origin and Race

(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, 2000e-16)

115. Plaintiff incorporates by reference the allegations of all preceding paragraphs.

116. Defendant treated Plaintiff less favorably than similarly situated employees who do not share her Hoklo Taiwanese identity or her protected EEO activity in the terms, conditions, and privileges of employment.

117. Plaintiff's Hoklo Taiwanese identity constitutes a cognizable "race" for purposes of Title VII and 42 U.S.C. § 1981. In *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987), the Supreme Court held that § 1981 (and by extension Title VII) protects against discrimination based on "ancestry or ethnic characteristics," including characteristics that nineteenth-century usage would have classified as racial but that modern classification might term "ethnic" or "national origin." Hoklo Taiwanese identity is defined by distinct linguistic heritage, pre-1945 Taiwanese ancestry, and cultural traditions persisting for fifteen or more generations — precisely the "ancestry or ethnic characteristics" protected under *Al-Khazraji*; accord *Village of Freeport v. Barrella*, 814 F.3d 594, 608–10 (2d Cir. 2016) (ethnicity constitutes race under Title VII and 42 U.S.C. § 1981); see also *El-Hakem v. BJY, Inc.*, 415 F.3d 1068, 1073 (9th Cir. 2005) (names and cultural

characteristics may serve as a proxy for race or ethnicity under Title VII). The United States Census Bureau's 2020 detailed race classification separately identifies "Taiwanese" as a distinct Asian subgroup, independent of "Chinese." Because "Taiwanese American" is an elective ethnic self-identification — individuals of Taiwan national origin who identify racially as Chinese do not adopt it — Plaintiff's self-identification reflects a deliberate ancestral and ethnic choice, not a derivative of birthplace; the Agency's substitution of "Chinese" did not correct a label but overrode her chosen racial identity. Plaintiff's protected racial characteristic of Hoklo Taiwanese American is therefore fully cognizable under Title VII regardless of Agency OGC's efforts to collapse it into a generic "Asian" or "Chinese" category. Agency OEEO accepted Plaintiff's self-identification as "Asian American, Hoklo Taiwanese American" but progressively abbreviated it to "Hoklo" in official proceedings; Agency OGC then attacked that OEEO-created label as non-cognizable, while simultaneously characterizing Plaintiff's race as "Chinese" in multiple submissions. On de novo review, this Court is not bound by the administrative labels and should apply the self-identification Plaintiff consistently maintained throughout: national origin = Taiwan; race = Asian American, Hoklo Taiwanese American.

118. The disparate treatment alleged in Count IV is intra-national-origin and intra-racial discrimination—a recognized theory under Title VII in which the discriminating actors share the same broad national origin as the victim but identify with a distinct ethnic subgroup. Among the four Taiwan-origin employees in Plaintiff's unit: supervisor May F. self-identified as Hakka/Mainland Chinese; coworker Huey L. self-identified as "Taiwanese Chinese, i.e., Chinese who are born in Taiwan"; and Plaintiff identified as

Hoklo Taiwanese American. The ethnic hierarchy between Mainland Chinese (Mainlanders) (Waishengren, literal: "extra-provincial") and Benshengren (literal: "native Taiwanese," including Hoklo and Hakka) created by KMT political dominance from 1945 to 1988 is documented historical fact, recognized in the Agency's own National Intelligence Estimates (NIE 43-61 and NIE 43-64) and reflected in the CIA World Factbook (see ¶ 19). Discrimination directed at Plaintiff by supervisors and coworkers who identify with Mainland Chinese heritage, specifically because she is Hoklo Taiwanese, constitutes race and national origin discrimination even when the actors themselves share the same Taiwan national origin. EEOC Enforcement Guidance on National Origin Discrimination, No. 915.003 (Nov. 18, 2016), § II.A (intra-national-origin discrimination is covered).

119. Comparator SJ — of Taiwan national origin, self-identified as Asian, not Hoklo-identified, and without EEO activity — was favored in overtime assignments and team awards despite equivalent or inferior qualifications. ROI at 52–53, 549–550, 1436, 1439–1441.

120. The Agency's deliberate alteration of Plaintiff's protected bases — changing national origin from "Taiwan" to "Taiwanese" and race from "Taiwanese American" to "Hoklo" — reflects institutional refusal to recognize Taiwanese American identity as a cognizable protected characteristic, which is itself an act of disparate treatment. The manipulation was not incidental: Agency OEEO introduced the truncated "Hoklo" label by abbreviating Plaintiff's self-identification; Agency OGC then used that truncation to attack "Hoklo" as non-standard. Agency OGC further conflated Plaintiff's national origin ("Taiwan") with "Taiwanese" — collapsing the race/national-origin distinction — and

characterized Plaintiff's race as "Chinese" in multiple adversarial submissions, directly denying Requests for Admission Nos. 1 and 2. OGC compounded the administrative falsification in its October 4, 2023 Reply in Support of MSJ by fabricating May F.'s racial identity — sworn self-identified as Hakka/Mainland Chinese — characterizing May F. as 'Complainant-Taiwanese' at least twelve times to eliminate the intra-racial comparator differential that would otherwise have established Count IV, and constituting a willful false statement under 18 U.S.C. § 1001. OGC separately redacted all race and national origin data from its version of Interrogatory No. 8 produced to Plaintiff, without invoking or possessing legal authority to do so. These willful misrepresentations — adopted verbatim by the AJ (Decision at 3–4) and OFO (Decision at 4–5) without independent analysis — constitute fraud on the tribunal under *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), and warrant this Court's de novo review without deference to the tainted administrative record. Plaintiff raised these manipulations at every administrative stage; the AJ and OFO ignored them. On de novo review, the Court should apply Plaintiff's consistently stated self-identification and the evidence as submitted in the unclassified administrative record.

121. Direct evidence of discriminatory animus also appears in the characterization of Plaintiff's performance deficiencies. Supervisor May F.'s written performance evaluations and documented communications reflect an expectation that Plaintiff, as an Asian American employee, should be "submissive" and accept management directives without assertion or complaint. This stereotype is corroborated by May F.'s contemporaneous feedback concerning other Asian female instructors — faulting one for failing to present a "united front" and counseling another to "speak less so her colleague

can express his view" (AP at 210, May F. email to Anna C., Aug. 18, 2020) — reflecting a documented pattern of racially stereotyped expectations of submissiveness inconsistent with Plaintiff's professional conduct. Penalizing an Asian American employee for failing to conform to a stereotyped expectation of deference and non-assertion constitutes discrimination on the basis of race under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250–51 (1989) (sex stereotyping is sex discrimination; racial stereotyping is race discrimination by the same logic). *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 (2015). May F.'s characterization of Plaintiff's EEO-protected assertions as "poor professional behavior" in the close-out PSR is stereotyped motive — direct evidence that bypasses the *McDonnell Douglas* burden-shifting framework entirely.

122. Defendant's proffered reasons for adverse actions are pretextual. The unexplained AWP placement and rescission, favorable comparator treatment, and Jacqueline L.'s demonstrably false affidavit establish that stated rationales are unworthy of credence. The demonstrated falsity of the Agency's proffered explanations is itself probative evidence of discrimination, permitting the trier of fact to infer that the true reason was unlawful. See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000).

123. Jacqueline L.'s sworn affidavit falsely stated that comparators Huey L., SJ, NS received only "non-monetary" awards, a characterization directly refuted by Agency documents, confirming that monetary awards were given. Agency OGC never withdrew or corrected this false statement in any subsequent submission to the AJ or OFO. The submission of a sworn false affidavit on a key comparator issue — demonstrably contradicted by the Agency's own documents in the same record — constitutes fraud on the administrative tribunal within the meaning of *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S.

238, 245–46 (1944), and a violation of 18 U.S.C. § 1001. Because the AJ and OFO relied on the Agency's factual record — which included this uncorrected false affidavit — to find no favorable comparator treatment, the Count IV disparate treatment finding rests on a materially unreliable evidentiary foundation and is entitled to no deference in this Court. Plaintiff specifically identified the false-affidavit issue in the Opposition to Agency's Motion for Summary Judgment (September 18, 2023), Appeal Brief (March 19, 2024), and RFR Brief (October 20, 2026) as an unadjudicated and clearly erroneous interpretation of a material fact under 29 C.F.R. § 1614.405(c)(1); OFO's April 6, 2026 denial dismissed all substantive RFR grounds without engagement, leaving this fraud-on-tribunal argument unaddressed by any administrative adjudicator at any level and affording no basis for deference to the comparator finding that rested on the false affidavit on de novo review in this Court.

124. Additionally, in support of summary judgment Agency OGC relied on and advanced coworker Huey L.'s fabricated reports against Plaintiff — including his fabricated March 2021 account of Plaintiff's purported absences — which the AJ credited as factual without inquiry or sanction. Together with the uncorrected false affidavit of Jacqueline L. (see ¶ 123), that fabricated material distorted the factual record on which Count IV's adverse comparator findings rest. A decision procured on such a record is subject to vacatur as a fraud on the tribunal under *Hazel-Atlas*, 322 U.S. at 245–46, and warrants de novo adjudication in this Court.

125. Alternatively, and without prejudice to Plaintiff's direct discrimination theory, all adverse employment actions in Count IV are actionable under the mixed-motive framework of the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2(m). Under that standard, Plaintiff needs

only to demonstrate that her Hoklo Taiwanese identity or national origin (Taiwan) was a "motivating factor" in each adverse decision, not the sole or exclusive cause. Where, as here, documentary evidence establishes that supervisors May F. and Sondes D. identified with Mainland(er) Chinese heritage and directed ethnically discriminatory language and performance actions against a Taiwanese American employee in the unit, discriminatory animus was at a minimum a motivating factor in each adverse action. Under § 2000e-2(m), this establishes liability even if Defendant also proffers a legitimate performance rationale. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244–45 (1989) (plurality); *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) (§ 2000e-2(m) requires only circumstantial evidence).

126. Supervisor May F.'s April 22, 2021 post-separation inquiry into reporting Plaintiff to security and revisiting Plaintiff's security status — initiated six days after Plaintiff's resignation and documented in Agency Discovery Production at 215 — is further evidence of the continuing retaliatory and discriminatory animus established in ¶¶ 116–125, directed at Plaintiff's Hoklo Taiwanese identity and prior protected EEO activity. Post-resignation retaliatory conduct is cognizable under Title VII. *Green v. Brennan*, 578 U.S. 547 (2016). Plaintiff does not ask this Court to review or disturb any security-clearance determination; she challenges only the retaliatory making of an unsubstantiated referral.

127. As a direct and proximate result, Plaintiff suffered the damages set forth above.

## <u>VII. DAMAGES</u>

128. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer:

**(a)** Lost wages, salary, benefits, and retirement contributions from April 16, 2021 through judgment, computed at the grade and step commensurate with Plaintiff's but-for career trajectory (GS/GG-15 equivalent), with prejudgment interest at the applicable Treasury rate and a tax gross-up to neutralize adverse income tax consequences of a lump-sum award, estimated in excess of $500,000 and to be determined with precision at trial, and recoverable as make-whole relief under 42 U.S.C. § 2000e-5(g)(1);

**(b)** Reinstatement to a CIA position at no lower than the GS/GG-15 equivalent of Plaintiff's current federal grade, as the primary equitable remedy; or, in lieu thereof, lost future earning capacity and front pay computed at the GS/GG-15 grade level through Plaintiff's anticipated retirement, reflecting the career trajectory Plaintiff would have followed absent the discrimination;

**(c)** Compensatory damages for physical harm — including a serious medical condition with symptomatic onset during the period of maximum workplace harassment, requiring hospitalized surgery — subject, together with subparagraph (d), to the combined statutory cap of $300,000 under 42 U.S.C. § 1981a(b)(3)(D);

**(d)** Compensatory damages for emotional distress, humiliation, and loss of dignity;

**(e)** Out-of-pocket expenses incurred as a proximate result of the discriminatory and retaliatory conduct, including: (i) deposition costs in the amount of $16,401 paid to Ace-Federal Reporters, Inc., under irregular billing practices deviating from GSA contract maxima; and (ii) reasonable legal database and research subscription expenses; and

**(f)** Award ATTORNEY'S FEES, expert fees, litigation expenses, and COSTS incurred in this action and in the related administrative proceedings, pursuant to 42 U.S.C. §

2000e-5(k) and *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54 (1980); *see also* *Chris v. Tenet*, 221 F.3d 648 (4th Cir. 2000) (applying *Carey* in a Title VII action against the Director of the CIA); and

**(g)** Such other and further damages as the Court deems just and proper.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ann D. Yang, Ph.D. respectfully prays that this Court:

**(a)** Enter a DECLARATORY JUDGMENT that Defendant violated Title VII by subjecting Plaintiff to retaliation (including retaliatory obstruction of the EEO process), a hostile work environment, constructive discharge, and disparate treatment;

**(b)** Order Plaintiff's REINSTATEMENT to a CIA position at a grade and step commensurate with her qualifications and but-for career trajectory—no lower than the GS/GG-15 equivalent reflecting her current federal grade—with full restoration of benefits and seniority (any security-clearance determination to be made by the Agency through its own processes). Make-whole relief under 42 U.S.C. § 2000e-5(g) requires reinstatement to the grade Plaintiff would have attained absent the discrimination, as demonstrated by her current GS/GG-15 classification at another federal agency. In lieu of reinstatement, the Court should award FRONT PAY reflecting the present value of lost future earnings computed at the GS/GG-15 grade level through Plaintiff's anticipated retirement, front pay being an equitable remedy not subject to the 42 U.S.C. § 1981a cap (*Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843 (2001));

**(c)** Award BACK PAY representing all wages, salary, benefits, and retirement contributions lost from April 16, 2021, through the date of judgment (less interim

earnings under 42 U.S.C. § 2000e-5(g)(1)), computed at the grade and step commensurate with Plaintiff's but-for career trajectory (GS/GG-15 equivalent), together with prejudgment interest at the applicable Treasury rate and a TAX GROSS-UP sufficient to neutralize any adverse federal and state income tax consequences attributable to receipt of a lump-sum back pay award, consistent with the make-whole remedial purpose of Title VII, 42 U.S.C. § 2000e-5(g)(1);

**(d)** Award COMPENSATORY DAMAGES for physical harm (including documented health consequences attributable to the discriminatory and retaliatory work environment), emotional distress, and loss of dignity, up to the combined statutory maximum of $300,000 under 42 U.S.C. § 1981a(b)(3)(D), together with reimbursement for all reasonable out-of-pocket expenses incurred as a proximate result of the discriminatory conduct, including deposition costs ($16,401 paid to Ace-Federal Reporters, Inc.) and legal database and research subscription expenses;

**(e)** Order CORRECTION AND EXPUNGEMENT of Plaintiff's official personnel records, including: (i) correction of the FY 2020 and FY 2021 Performance Summary Reports (PSRs) to remove discriminatory and retaliatory commentary and, where appropriate, to elevate performance ratings to "Meets Expectations" or higher; (ii) retroactive (nunc pro tunc) inclusion of Plaintiff's name in the December 8, 2020 Team Award from which she was excluded in retaliation for protected EEO activity; (iii) expungement of the pretextual 90-day Advanced Work Plan (AWP) and all associated documentation from Plaintiff's personnel file; and (iv) placement of a notation in the official personnel files of each Responsible Management Official found to have engaged in discrimination, harassment, or retaliation, as the Court may order; and (v) restoration

of all annual, sick, and other leave that Plaintiff was compelled to expend as a result of the discriminatory and retaliatory conduct, together with official time wrongfully denied for Plaintiff's EEO participation;

**(f)** Award ATTORNEY'S FEES and costs in this action and in the related administrative proceedings, pursuant to 42 U.S.C. § 2000e-5(k) and *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54 (1980); *see also Chris v. Tenet*, 221 F.3d 648 (4th Cir. 2000) (applying *Carey* in a Title VII action against the Director of the CIA);

**(g)** Enter INJUNCTIVE RELIEF requiring Defendant to: (i) structurally separate CIA OEEO from CIA OGC functions; (ii) prohibit supervisory ex parte communications with EEO adjudicators; (iii) require Agency deposition costs to be assessed at prevailing market rates; (iv) prohibit use of security referrals as a mechanism to retaliate against EEO complainants; and (v) prohibit the assignment of any individual who has been identified as a Responsible Management Official in a pending or adjudicated EEO proceeding to any EEO counseling, investigation, or oversight function within the Agency;

**(h)** Award such OTHER AND FURTHER RELIEF as this Court deems just, equitable, and proper.

## IX. JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable. 42 U.S.C. § 1981a(c).

## X. VERIFICATION (28 U.S.C. § 1746)

I, Ann D. Yang, Ph.D., declare under penalty of perjury under the laws of the United States that the factual allegations set forth in the foregoing Complaint are true and correct of my own personal knowledge, except as to those matters stated on information and belief, and as to those matters I believe them to be true.

Ann D. Yang, Ph.D.

Name of Pro Se Party (Print or Type)

Signature of Pro Se Party

Executed on: July 2, 2026 (Date)

## XI. CERTIFICATION AND CLOSING (FED. R. CIV. P. 11)

Under Federal Rule of Civil Procedure 11, by signing below, Plaintiff certifies to the best of her knowledge, information, and belief that this Complaint: (1) is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) otherwise complies with the requirements of Rule 11.

Plaintiff agrees to provide the Clerk's Office with any changes to the address where case-related papers may be served. Plaintiff understands that a failure to keep a current address on file with the Clerk's Office may result in the dismissal of this case.

Respectfully submitted,

Ann D. Yang, Ph.D.
Plaintiff, Pro Se
10449 White Granite Drive, Unit 37
Oakton, VA 22124
(703) 755-0206
anneyang.va@gmail.com

Dated: July 2, 2026

# LOCAL RULE 83.1(N) CERTIFICATION

**I declare under penalty of perjury that:**

No attorney has prepared or assisted in the preparation of the Complaint for Violations of Title VII of the Civil Rights Act of 1964.

Ann D. Yang, Ph.D.

Name of Pro Se Party (Print or Type)

Signature of Pro Se Party

Executed on: July 2, 2026 (Date)

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing

Complaint and all accompanying documents

, was served on ____________________, to the following:

**Attorney General of the United States**
**U.S. Department of Justice**
**950 Pennsylvania Avenue, NW**
**Washington, DC 20530-0001**

**United States Attorney for the Eastern District of Virginia**
**Attn: Civil Process Clerk**
**2100 Jamieson Avenue**
**Alexandria, VA 22314**

**Central Intelligence Agency**
**Litigation Division**
**Office of General Counsel**
**Washington, DC 20505**

**John Ratcliffe, Director of the Central Intelligence Agency**
**Litigation Division**
**Office of General Counsel**
**Central Intelligence Agency**
**Washington, DC 20505**

Ann D. Yang, Ph.D., Plaintiff Pro Se
Dated: ____________________